# DEEPSOUTH PACKING CO., INC. *v.* LAITRAM CORP.

No. 71–315.   Argued April 11, 1972—Decided May 30, 1972

WHITE, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, STEWART, and MARSHALL, JJ., joined.  BLACKMUN, J., filed a dissenting opinion, in which BURGER, C. J., and POWELL and REHNQUIST, JJ., joined, *post*, p. 532.

*Harold J. Birch* argued the cause for petitioner.   With him on the briefs were *C. Emmett Pugh* and *William W. Beckett.*

*Guy W. Shoup* argued the cause and filed a brief for respondent.

*Edward S. Irons* and *Mary Helen Sears* filed a brief as *amici curiae* urging reversal.

MR. JUSTICE WHITE delivered the opinion of the Court.

The United States District Court for the Eastern District of Louisiana has written:

"Shrimp, whether boiled, broiled, barbecued or fried, are a gustatory delight, but they did not evolve

to satisfy man's palate. Like other crustaceans, they wear their skeletons outside their bodies in order to shield their savory pink and white flesh against predators, including man. They also carry their intestines, commonly called veins, in bags (or sand bags) that run the length of their bodies. For shrimp to be edible, it is necessary to remove their shells. In addition, if the vein is removed, shrimp become more pleasing to the fastidious as well as more palatable." [1]

Such "gustatory" observations are rare even in those piscatorially favored federal courts blissfully situated on the Nation's Gulf Coast, but they are properly recited in this case. Petitioner and respondent both hold patents on machines that devein shrimp more cheaply and efficiently than competing machinery or hand labor can do the job. Extensive litigation below has established that respondent, the Laitram Corp., has the superior claim and that the distribution and use of petitioner Deepsouth's machinery in this country should be enjoined to prevent infringement of Laitram's patents. *Laitram Corp.* v. *Deepsouth Packing Co.*, 443 F. 2d 928 (CA5 1971). We granted certiorari, 404 U. S. 1037 (1972), to consider a related question: Is Deepsouth, barred from the American market by Laitram's patents, also foreclosed by the patent laws from exporting its deveiners, in less than fully assembled form, for use abroad?

I

A rudimentary understanding of the patents in dispute is a prerequisite to comprehending the legal issue presented. The District Court determined that the Laitram Corp. held two valid patents for machin-

---

[1] *Laitram Corp.* v. *Deepsouth Packing Co.*, 301 F. Supp. 1037, 1040 (1969).

ery used in the process of deveining shrimp. One, granted in 1954,[2] accorded Laitram rights over a "slitter" which exposed the veins of shrimp by using water pressure and gravity to force the shrimp down an inclined trough studded with razor blades. As the shrimp descend through the trough their backs are slit by the blades or other knife-like objects arranged in a zig-zag pattern. The second patent, granted in 1958, covers a "tumbler," "a device to mechanically remove substantially all veins from shrimp whose backs have previously been slit," App. 127, by the machines described in the 1954 patent. This invention uses streams of water to carry slit shrimp into and then out of a revolving drum fabricated from commercial sheet metal. As shrimp pass through the drum the hooked "lips" of the punched metal, "projecting at an acute angle from the supporting member and having a smooth rounded free edge for engaging beneath the vein of a shrimp and for wedging the vein between the lip and the supporting member," App. 131, engage the veins and remove them.

Both the slitter and the tumbler are combination patents; that is,

> "[n]one of the parts referred to are new, and none are claimed as new; nor is any portion of the combination less than the whole claimed as new, or stated to produce any given result. The end in view is proposed to be accomplished by the union of all, arranged and combined together in the manner described. And this combination, composed of all the parts mentioned in the specification, and arranged with reference to each other, and to other

---

[2] This patent expired shortly before argument in this court and is therefore not relevant to Laitram's claim for injunctive relief. It is described, however, because Laitram claims damages for Deepsouth's asserted past exportation of the parts of this machine.

parts of the [machine] in the manner therein described, is stated to be the improvement, and is the thing patented." *Prouty* v. *Ruggles,* 16 Pet. 336, 341 (1842).

The slitter's elements as recited in Laitram's patent claim were: an inclined trough, a "knife" (actually, knives) positioned in the trough, and a means (water sprayed from jets) to move the shrimp down the trough. The tumbler's elements include a "lip," a "support member," and a "means" (water thrust from jets). As is usual in combination patents, none of the elements in either of these patents were themselves patentable at the time of the patent, nor are they now. The means in both inventions, moving water, was and is, of course, commonplace. (It is not suggested that Deepsouth infringed Laitram's patents by its use of water jets.) The cutting instruments and inclined troughs used in slitters were and are commodities available for general use. The structure of the lip and support member in the tumbler were hardly novel: Laitram concedes that the inventors merely adapted punched metal sheets ordered from a commercial catalog in order to perfect their invention. The patents were warranted not by the novelty of their elements but by the novelty of the combination they represented. Invention was recognized because Laitram's assignors[3] combined ordinary elements in an extraordinary way—a novel union of old means was designed to achieve new ends.[4] Thus,

---

[3] The machines were developed by two brothers who are now president and vice-president of the Laitram Corp. The patents are in their names, but have been assigned to the corporation.

[4] The District Court wrote:

"Defendant urges that the [1958] patent is invalid as aggregative, anticipated by the prior art, obvious, described in functional language, overbroad, and indefinite. While it is clear that the elements in

for both inventions "the whole in some way exceed[ed] the sum of its parts." *Great A. & P. Tea Co.* v. *Supermarket Equipment Corp.,* 340 U. S. 147, 152 (1950).

## II

The lower court's decision that Laitram held valid combination patents entitled the corporation to the privileges bestowed by 35 U. S. C. § 154, the keystone provision of the patent code. "[F]or the term of seventeen years" from the date of the patent, Laitram had "the right to exclude others from making, using, or selling the invention throughout the United States . . . ." The § 154 right in turn provides the basis for affording the patentee an injunction against direct, induced, and contributory infringement, 35 U. S. C. § 283, or an award of damages when such infringement has already occurred, 35 U. S. C. § 284. Infringement is defined by 35 U. S. C. § 271 in terms that follow those of § 154:

> "(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, [directly] infringes the patent.
>
> "(b) Whoever actively induces infringement of a patent shall be liable as an infringer.
>
> "(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringe-

---

the . . . patent, especially the punch lip material, had been available for a considerable period of time, when combined they co-act in such a manner to perform a new function and produce new results." 301 F. Supp., at 1063.

ment of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, shall be liable as a contributory infringer."

As a result of these provisions the judgment of Laitram's patent superiority forecloses Deepsouth and its customers from any future use (other than a use approved by Laitram or occurring after the Laitram patent has expired) of its deveiners "throughout the United States." The patent provisions taken in conjunction with the judgment below also entitle Laitram to the injunction it has received prohibiting Deepsouth from continuing to "make" or, once made, to "sell" deveiners "throughout the United States." Further, Laitram may recover damages for any past unauthorized use, sale, or making "throughout the United States." This much is not disputed.

But Deepsouth argues that it is not liable for every type of past sale and that a portion of its future business is salvageable. Section 154 and related provisions obviously are intended to grant a patentee a monopoly only over the United States market; they are not intended to grant a patentee the bonus of a favored position as a flagship company free of American competition in international commerce. Deepsouth, itself barred from using its deveining machines, or from inducing others to use them "throughout the United States," barred also from making and selling the machines in the United States, seeks to make the parts of deveining machines, to sell them to foreign buyers, and to have the buyers assemble the parts and use the machines abroad.[5] Ac-

---

[5] Deepsouth is entirely straightforward in indicating that its course of conduct is motivated by a desire to avoid patent infringement. Its president wrote a Brazilian customer:

"We are handicapped by a decision against us in the United States. This was a very technical decision and we can manufacture the entire

cordingly, Deepsouth seeks judicial approval, expressed through a modification or interpretation of the injunction against it, for continuing its practice of shipping deveining equipment to foreign customers in three separate boxes, each containing only parts of the 1¾-ton machines, yet the whole assemblable in less than one hour.[6] The company contends that by this means both the "making" and the "use" of the machines occur abroad and Laitram's lawful monopoly over the making and use of the machines throughout the United States is not infringed.

Laitram counters that this course of conduct is based upon a hypertechnical reading of the patent code that, if tolerated, will deprive it of its right to the fruits of the inventive genius of its assignors. "The right to make can scarcely be made plainer by definition . . . ," *Bauer* v. *O'Donnell*, 229 U. S. 1, 10 (1913). Deepsouth in all respects save final assembly of the parts "makes" the invention. It does so with the intent of having the foreign user effect the combination without Laitram's permission. Deepsouth sells these components as though they were the machines themselves; the act of assembly is regarded, indeed advertised, as of no importance.

The District Court, faced with this dispute, noted that three prior circuit courts had considered the meaning of "making" in this context and that all three had resolved the question favorably to Deepsouth's posi-

---

machine without any complication in the United States, with the exception that there are two parts that must not be assembled in the United States, but assembled after the machine arrives in Brazil."

Quoted in *Laitram Corp.* v. *Deepsouth Packing Co.*, 443 F. 2d 928, 938 (CA5 1971).

[6] As shipped, Deepsouth's tumbler contains a deveining belt different from Laitram's support member and lip. But the Laitram elements are included in a separate box and the Deepsouth tumbler is made to accommodate the Laitram elements. The record shows that many customers will use the machine with the Laitram parts.

tion. See *Hewitt-Robins, Inc.* v. *Link-Belt Co.*, 371 F. 2d 225 (CA7 1966); *Cold Metal Process Co.* v. *United Engineering & Foundry Co.*, 235 F. 2d 224 (CA3 1956); and *Radio Corp. of America* v. *Andrea*, 79 F. 2d 626 (CA2 1935). The District Court held that its injunction should not be read as prohibiting export of the elements of a combination patent even when those elements could and predictably would be combined to form the whole.

> "It may be urged that . . . [this] result is not logical . . . . But it is founded on twin notions that underlie the patent laws. One is that a combination patent protects only the combination. The other is that monopolies—even those conferred by patents—are not viewed with favor. These are logic enough." 310 F. Supp. 926, 929 (1970).

The Court of Appeals for the Fifth Circuit reversed, thus departing from the established rules of the Second, Third, and Seventh Circuits. In the Fifth Circuit panel's opinion, those courts that previously considered the question "worked themselves into . . . a conceptual box" by adopting "an artificial, technical construction" of the patent laws, a construction, moreover, which in the opinion of the panel, "[subverted] the Constitutional scheme of promoting 'the Progress of Science and useful Arts' " by allowing an intrusion on a patentee's rights, 443 F. 2d, at 938–939, citing U. S. Const., Art. I, § 8.

## III

We disagree with the Court of Appeals for the Fifth Circuit.[7] Under the common law the inventor had no

---

[7] For simplicity's sake, we, like the lower courts, will discuss only Deepsouth's claim as to permissible future conduct. It is obvious, however, that what we say as to the scope of the injunction in Laitram's favor applies also to the calculation of damages that Laitram may recover.

right to exclude others from making and using his invention. If Laitram has a right to suppress Deepsouth's export trade it must be derived from its patent grant, and thus from the patent statute.[8]  We find that 35 U. S. C. § 271, the provision of the patent laws on which Laitram relies, does not support its claim.

Certainly if Deepsouth's conduct were intended to lead to use of patented deveiners inside the United States its production and sales activity would be subject to injunction as an induced or contributory infringement.  But it is established that there can be no contributory infringement without the fact or intention of a direct infringement.  "In a word, if there is no [direct] infringement of a patent there can be no contributory infringer." *Mercoid Corp.* v. *Mid-Continent Co.*, 320 U. S. 661, 677 (1944) (Frankfurter, J., dissenting on other grounds).  *Aro Mfg. Co.* v. *Convertible Top Replacement Co.*, 365 U. S. 336, 341–342 (1961), succinctly articulates the law:

> "It is plain that § 271 (c)—a part of the Patent Code enacted in 1952—made no change in the fundamental precept that there can be no contributory infringement in the absence of a direct infringement.  That section defines contributory infringement in terms of direct infringement—namely the sale of a component of a patented combination or machine for use 'in an infringement of such patent.' "

---

[8] "But the right of property which a patentee has in his invention, and his right to its exclusive use, is derived altogether from these statutory provisions; and this court [has] always held that an inventor has no right of property in his invention, upon which he can maintain a suit, unless he obtains a patent for it, according to the acts of Congress; and that his rights are to be regulated and measured by these laws, and cannot go beyond them." *Brown* v. *Duchesne*, 19 How. 183, 195 (1857).

The statute makes it clear 'that it is not an infringement to make or use a patented product outside of the United States. 35 U. S. C. § 271. See also *Dowagiac Mfg. Co.* v. *Minnesota Moline Plow Co.,* 235 U. S. 641, 650 (1915), *Brown* v. *Duchesne,* 19 How. 183 (1857). Thus, in order to secure the injunction it seeks, Laitram must show a § 271 (a) direct infringement by Deepsouth in the United States, that is, that Deepsouth "makes," "uses," or "sells" the patented product within the bounds of this country.

Laitram does not suggest that Deepsouth "uses" the machines. Its argument that Deepsouth sells the machines—based primarily on Deepsouth's sales rhetoric and related indicia such as price [9]—cannot carry the day unless it can be shown that Deepsouth is selling the "patented invention." The sales question thus resolves itself into the question of manufacture: did Deepsouth "make" (and then sell) something cognizable under the patent law as the patented invention, or did it "make" (and then sell) something that fell short of infringement?

The Court of Appeals, believing that the word "makes" should be accorded "a construction in keeping with the ordinary meaning of that term," 443 F. 2d, at 938, held against Deepsouth on the theory that "makes" "means what it ordinarily connotes—the substantial manufacture of the constituent parts of the machine." *Id.,* at 939. Passing the question of whether this definition more closely corresponds to the ordinary meaning of the term than that offered by Judge Swan in *Andrea* 35 years earlier (something is made when it reaches the state of

---

[9] Deepsouth sold the less than completely assembled machine for the same price as it had sold fully assembled machines. Its advertisements, correspondence, and invoices frequently referred to a "machine," rather than to a kit or unassembled parts. See Brief for Respondent 8–11.

final "operable" assembly), we find the Fifth Circuit's definition unacceptable because it collides head on with a line of decisions so firmly embedded in our patent law as to be unassailable absent a congressional recasting of the statute.

We cannot endorse the view that the "substantial manufacture of the constituent parts of [a] machine" constitutes direct infringement when we have so often held that a combination patent protects only against the operable assembly of the whole and not the manufacture of its parts. "For as we pointed out in *Mercoid* v. *Mid-Continent Investment Co.,* [320 U. S. 661, 676] a patent on a combination is a patent on the assembled or functioning whole, not on the separate parts." *Mercoid Corp.* v. *Minneapolis-Honeywell Regulator Co.,* 320 U. S. 680, 684 (1944). See also *Leeds & Catlin Co.* v. *Victor Talking Machine Co.,* 213 U. S. 301:

> "A combination is a union of elements, which may be partly old and partly new, or wholly old or wholly new. But whether new or old, the combination is a means—an invention—distinct from them." *Id.,* at 318.

> .    .    .    .    .

> "[O]ne element is not the combination. Indeed, all of the elements are not. To be that—to be identical with the invention of the combination—they must be united by the same operative law." *Id.,* at 320.

And see *Brown* v. *Guild,* 23 Wall. 181 (1874). In sum,

> "[i]f anything is settled in the patent law, it is that the combination patent covers only the totality of the elements in the claim and that no element, separately viewed, is within the grant." *Aro Mfg. Co.* v. *Convertible Top Replacement Co.,* 365 U. S., at 344.

It was this basic tenet of the patent system that led Judge Swan to hold in the leading case, *Radio Corp. of America* v. *Andrea,* 79 F. 2d 626 (1935), that unassembled export of the elements of an invention did not infringe the patent.

"[The] relationship is the essence of the patent.

". . . No wrong is done the patentee until the combination is formed. His monopoly does not cover the manufacture or sale of separate elements capable of being, but never actually, associated to form the invention. Only when such association is made is there a direct infringement of his monopoly, and not even then if it is done outside the territory for which the monopoly was granted." *Id.,* at 628.

See also *Cold Metal Process Co.* v. *United Engineering & Foundry Co.,* 235 F. 2d, at 230 ("We are in full accord with the rule thus laid down in the Andrea case and we think that the master and the district court were right in applying it here"); *Hewitt-Robins, Inc.* v. *Link Belt Co.,* 371 F. 2d, at 229 (to the same effect).

We reaffirm this conclusion today.

## IV

It is said that this conclusion is derived from too narrow and technical an interpretation of the statute, and that this Court should focus on the constitutional mandate

"[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries . . . ," Art. I, § 8,

and construe the statute in a manner that would, allegedly, better reflect the policy of the Framers.

We cannot accept this argument. The direction of Art. I is that *Congress* shall have the power to promote the progress of science and the useful arts. When, as here, the Constitution is permissive, the sign of how far Congress has chosen to go can come only from Congress. We are here construing the provisions of a statute passed in 1952. The prevailing law in this and other courts as to what is necessary to show a patentable invention when a combination of old elements is claimed was clearly evident from the cases when the Act was passed; and at that time *Andrea,* representing a specific application of the law of infringement with respect to the export of elements of a combination patent, was 17 years old. When Congress drafted § 271, it gave no indication that it desired to change either the law of combination patents as relevant here or the ruling of *Andrea.*[10] Nor has it on any more recent occasion indicated that it wanted the patent privilege to run farther than it was understood to run for 35 years prior to the action of the Court of Appeals for the Fifth Circuit.

Moreover, we must consider petitioner's claim in light of this Nation's historical antipathy to monopoly [11] and of repeated congressional efforts to preserve and foster competition. As this Court recently said without dissent:

> "[I]n rewarding useful invention, the 'rights and welfare of the community must be fairly dealt

---

[10] When § 271 was drafted and submitted to the Senate in 1952, Senator Saltonstall asked: "Does the bill change the law in any way or only codify the present patent laws?" Senator McCarran, Chairman of the Judiciary Committee, responded: "It codifies the present patent laws." 98 Cong. Rec. 9323.

[11] See the discussion in *Graham* v. *John Deere Co.,* 383 U. S. 1, 7 *et seq.* (1966).

with and effectually guarded.' *Kendall* v. *Winsor*, 21 How. 322, 329 (1859). To that end the prerequisites to obtaining a patent are strictly observed, and when the patent has issued the limitations on its exercise are equally strictly enforced." *Sears, Roebuck & Co.* v. *Stiffel Co.*, 376 U. S. 225, 230 (1964).

It follows that we should not expand patent rights by overruling or modifying our prior cases construing the patent statutes, unless the argument for expansion of privilege is based on more than mere inference from ambiguous statutory language. We would require a clear and certain signal from Congress before approving the position of a litigant who, as respondent here, argues that the beachhead of privilege is wider, and the area of public use narrower, than courts had previously thought. No such signal legitimizes respondent's position in this litigation.

In conclusion, we note that what is at stake here is the right of American companies to compete with an American patent holder in foreign markets. Our patent system makes no claim to extraterritorial effect; "these acts of Congress do not, and were not intended to, operate beyond the limits of the United States," *Brown* v. *Duchesne*, 19 How., at 195; and we correspondingly reject the claims of others to such control over our markets. Cf. *Boesch* v. *Graff*, 133 U. S. 697, 703 (1890). To the degree that the inventor needs protection in markets other than those of this country, the wording of 35 U. S. C. §§ 154 and 271 reveals a congressional intent to have him seek it abroad through patents secured in countries where his goods are being used. Respondent holds foreign patents; it does not adequately explain why it does not avail itself of them.

## V

In sum: the case and statutory law resolves this case against the respondent. When so many courts have so often held what appears so evident—a combination patent can be infringed only by combination—we are not prepared to break the mold and begin anew. And were the matter not so resolved, we would still insist on a clear congressional indication of intent to extend the patent privilege before we could recognize the monopoly here claimed. Such an indication is lacking. Accordingly, the judgment of the Court of Appeals for the Fifth Circuit is reversed and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE, MR. JUSTICE POWELL, and MR. JUSTICE REHNQUIST join, dissenting.

Because our grant of certiorari was limited, 404 U. S. 1037 (1972), the customarily presented issues of patent validity and infringement are not before us in this case. I necessarily accept, therefore, the conclusion that the Laitram patents are valid and that the Deepsouth deveining machine, when manufactured and assembled in the United States, is an infringement. The Court so concedes. The Court, however, denies Laitram patent law protection against Deepsouth's manufacture and assembly when the mere assembly is effected abroad. It does so on the theory that there then is no "making" of the patented invention in the United States even though every part is made here and Deepsouth ships all the parts in response to an order from abroad.

With all respect, this seems to me to be too narrow a reading of 35 U. S. C. §§ 154 and 271 (a). In addition, the result is unduly to reward the artful com-

petitor who uses another's invention in its entirety and who seeks to profit thereby. Deepsouth may be admissive and candid or, as the Court describes it, *ante,* at 523 n. 5, "straightforward," in its "sales rhetoric," *ante,* at 527, but for me that rhetoric reveals the very iniquitous and evasive nature of Deepsouth's operations. I do not see how one can escape the conclusion that the Deepsouth machine was *made* in the United States, within the meaning of the protective language of §§ 154 and 271 (a). The situation, perhaps, would be different were parts, or even only one vital part, manufactured abroad. Here everything was accomplished in this country except putting the pieces together as directed (an operation that, as Deepsouth represented to its Brazilian prospect, would take "less than one hour"), all much as the fond father does with his little daughter's doll house on Christmas Eve. To say that such assembly, accomplished abroad, is not the prohibited combination and that it avoids the restrictions of our patent law, is a bit too much for me. The Court has opened the way to deny the holder of the United States combination patent the benefits of his invention with respect to sales to foreign purchasers.

I also suspect the Court substantially overstates when it describes *Radio Corp. of America* v. *Andrea,* 79 F. 2d 626 (CA2 1935), as a "leading case," *ante,* at 529, and when it imputes to Congress, in drafting the 1952 statute, an awareness of *Andrea*'s "prevailing law," *ante,* at 530. *Andrea* was seriously undermined only two years after its promulgation, when the Court of Appeals modified its decree on a second review. *Radio Corp. of America* v. *Andrea,* 90 F. 2d 612 (CA2 1937). Its author, Judge Swan himself, dissenting in part from the 1937 decision, somewhat ruefully allowed that his court was overruling the earlier decision. *Id.,* at 615. I therefore would follow the Fifth Circuit's opinion in the

present case, 443 F. 2d 936 (1971), and would reject the reasoning in the older and weakened *Andrea* opinion and in the Third and Seventh Circuit opinions that merely follow it.

By a process of only the most rigid construction, the Court, by its decision today, fulfills what Judge Clark, in his able opinion for the Fifth Circuit, distressingly forecast:

> "To hold otherwise [as the Court does today] would subvert the Constitutional scheme of promoting 'the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.' U. S. Const., art. I § 8 Cl. 8. It would allow an infringer to set up shop next door to a patent-protected inventor whose product enjoys a substantial foreign market and deprive him of this valuable business. If this Constitutional protection is to be fully effectuated, it must extend to an infringer who manufactures in the United States and then captures the foreign markets from the patentee. The Constitutional mandate cannot be limited to just manufacturing and selling within the United States. The infringer would then be allowed to reap the fruits of the American economy—technology, labor, materials, etc.—but would not be subject to the responsibilities of the American patent laws. We cannot permit an infringer to enjoy these benefits and then be allowed to strip away a portion of the patentee's protection." 443 F. 2d, at 939.

I share the Fifth Circuit's concern and I therefore dissent.