QUALITY TUBING, INC., Plaintiff,

v.

PRECISION TUBE HOLDINGS CORP., Precision Tube Technology, Inc., and Precision Tube Technology, Ltd., Defendants.

No. Civ.A. H–98–3236.

United States District Court,
S.D. Texas,
Houston District.

Sept. 10, 1999.

---

Albert Berton Deaver, Jr., Arnold White & Durkee, Houston, TX, for Plaintiff.

Donald L. Otto, Renner Otto Boisselle & Sklar, Cleveland, OH, Michael Paul Graham, Baker & Botts, Houston, TX, for Defendants.

## MEMORANDUM AND OPINION

ROSENTHAL, District Judge.

Plaintiff, Quality Tubing, Inc., alleges that defendants, Precision Tube Holdings Corp., Precision Tube Technology, Inc., and Precision Tube Technology, Ltd. (collectively "Precision Tube"), infringed two patents and breached the terms of a license agreement. Quality Tubing seeks a preliminary injunction to prevent Precision Tube from manufacturing coiled tubing potentially covered by Quality Tubing's patents. The manufacturing Quality Tubing asks this court to enjoin is manufacturing in Scotland, under a contract negotiated and executed in the United States with a Norwegian company. That contract called for delivery of the tubing in either the United Kingdom or Norway, for use in Norway. Quality Tubing argues that by entering into the contract, Precision Tube sold, or offered to sell, infringing coiled tubing in the United States. (Docket Entry Nos. 6 & 16).

Precision Tube has moved to dismiss or for summary judgment on the ground that the facts alleged and disclosed in the record show no act of patent infringement. Quality Tubing seeks to enjoin the manufacture of tubing outside the United States, for shipment outside the United States, to a customer outside the United States, for use outside the United States. The allegedly infringing goods will never enter the United States. Precision Tube asserts that, as a matter of law, it committed no act of infringement under the patent statutes because it did not make, use, sell, or offer to sell any infringing product in the United States.

The infringement issue in this case turns on the interpretation of a recent amendment to the United States patent law. In 1996, Congress amended the statute to make it an act of infringement to offer to sell, as well as to sell, "any patented invention, within the United States." 35 U.S.C. §§ 271(a) and (g). The issue is whether these provisions forbid: (1) an offer to sell a patented invention in the United States; or (2) an offer, in the United States, to sell a patented invention. Under the first interpretation, which Precision Tube advances, the phrase, "within the United States," qualifies "offer to sell." This interpretation requires the offer to be made within the United States and to contemplate a sale within the United States. Under the second interpretation, which Quality Tubing advocates, the phrase, "within

the United States," qualifies only the word "offer." Under this interpretation, an offer can be an act of infringement if the offer is made within the United States, regardless of where the contemplated sale will take place.

This court held an injunction hearing on February 1, 1999. Both parties have since filed supplemental briefs. Based on the pleadings; the motions, responses, and replies; the parties' submissions; the arguments of counsel; and the applicable law, this court finds that the first, narrower interpretation is consistent with statutory language and case law. This court DENIES Quality Tubing's motion for a preliminary injunction and GRANTS Precision Tube's motion for summary judgment dismissing the infringement claim. This court declines to continue to exercise supplemental jurisdiction to reach the state law breach of license claim, which is the subject of pending litigation in state court.

The reasons for these rulings are stated below.[1]

## I. Background

Quality Tubing is a Texas corporation created in 1976 to manufacture and sell coiled tubing to the oil industry. Before 1987, such tubing was manufactured from individual strips joined in a tube forming mill. The length of the tubing depended on the length of the strips, which were typically two thousand feet long or less. Responding to the oil industry's need for longer tubing, in late 1986 or early 1987, Quality Tubing's then-president, Jon Dubois, and a Quality Tubing salesman, Lawrence W. Smith, invented a method for creating longer coiled tubing. On March 18, 1987, Quality Tubing filed a patent application entitled a "Method and Apparatus for Producing Continuous Lengths of Coilable Tubing." On September 5, 1989, the Patent and Trademark Office issued Quality Tubing U.S. Patent No. 4,863,091. Quality Tubing acquired a related patent,

U.S. Patent No. 5,191,911, on March 9, 1993. The '911 patent, entitled "Continuous Length of Coilable Tubing," is a process patent covering a "system for making a long length of seam-welded tubing from shorter lengths of flat metal strip which are spliced end-to-end and formed into tubular form and seam-welded." (Docket Entry No. 16, Ex. C, '911 Patent, Abstract). Quality Tubing owns corresponding foreign patents to both the '091 patent and the related '911 patent in some foreign countries, including a corresponding patent to the '091 patent in the United Kingdom.

In April 1990, Lawrence Smith started Precision Tube Technology, Inc. ("Precision–US"), to compete with Quality Tubing in the manufacture and sale of coiled tubing. Smith also formed Precision Tube Technology, Ltd. ("Precision–UK"), a company organized under the Companies Act of Scotland, to manufacture coiled tubing in the United Kingdom. (Docket Entry No. 16, Ex. E, Deposition of Smith, p. 8). Precision Tube Holdings Corp. ("Precision–Holding"), a Delaware corporation, is a holding company that owns the stock of Precision–US and Precision–UK. Precision–Holding does not manufacture, offer for sale, or sell any product. (Docket Entry No. 12, Ex. 1, Declaration of Smith, ¶ 2).

In 1992, Quality Tubing sued Precision–US and Lawrence Smith in this court for patent infringement.[2] This court entered summary judgment against Precision–US, finding that Precision–US and Smith had infringed claims 2, 3, 5, and 18 of the '091 patent. Quality Tubing and Precision–US entered into a settlement agreement that included a license agreement. Under that license agreement, Quality Tubing granted Precision–US a limited, nonexclusive license to practice the invention embodied in the '091 and '911 patents by making coiled tubing in the United States, covered by those patents, for sale and use in or outside this country. In exchange, Precision–

---

1. Quality Tubing's motion for expedited discovery is moot. (Docket Entry No. 5).

2. *Quality Tubing, Inc. v. Precision Tube Technology, Inc. and Lawrence W. Smith,* H–92–103.

US agreed to pay Quality Tubing a royalty.

The parties agree that Quality Tubing granted Precision–US a "nonexclusive license to make in the United States and sell anywhere in the world for use anywhere in the world coiled tubing covered by the '091 and '911 patents." (Docket Entry No. 12, p. 1). Quality Tubing granted the license only to Precision–US "and not to any then-existing or future parent or sister company of Precision–US." (Docket Entry No. 6, p. 3). The license did not grant Precision–US the right to sub-license its limited rights. Quality Tubing did not grant Precision–US a license to any other Quality Tubing patent, including the foreign counterparts to the '091 and '911 patents. The parties dispute whether the license agreement prohibits Precision–US from offering to sell or from selling in the United States coiled tubing manufactured abroad.

On September 23, 1997, Precision–US signed a contract with Stolt Comex Seaway A/S ("Stolt"), a Norwegian company, to manufacture coiled tubing for Stolt (the "Stolt Contract"). Under the Stolt Contract, Precision Tube [3] agreed to manufacture coiled tubing, for delivery to Stolt in Europe, from 1998 through 2000. (Docket Entry No. 12, Ex. 1, Declaration of Smith, ¶ 6). Precision Tube would either make the tubing available for shipment in Peterhead, U.K., or, at Stolt's option, deliver it to a port on the west coast of Norway. Stolt intended to use the tubing in a North Sea project. (*Id.*, ¶ 7). The Stolt Contract did not specify where the tubing was to be manufactured.

The events leading up to the signing of the contract are largely undisputed. In response to an inquiry from Stolt, Precision–US sent Stolt a budget quotation for coiled tubing on September 11, 1996. On April 30, 1997, Stolt requested a formal contract bid. Dennis Dunlap, an employee of Precision–US, prepared the formal bid in Houston, Texas and submitted the bid to Stolt in Norway at the end of May 1997. In June 1997, Stolt and Precision–US exchanged documents by facsimile transmission between Norway and Texas. On June 19, 1997, three Stolt employees traveled from Norway to meet with Precision Tube representatives in Houston, Texas, at the office of Precision–US, to discuss a proposed contract. After the meeting, the parties continued to correspond. Stolt audited the manufacturing facilities of both Precision–US and Precision–UK. On September 23, 1997, representatives of Stolt and Precision–US met in Houston at the office of Precision–US and signed the Stolt Contract. Precision–Holding executed a performance guarantee of the Stolt Contract.

Precision Tube has not delivered any tubing under the Stolt Contract. (Docket Entry No. 28, Joint Statement of Uncontested Facts, ¶ 18). The coiled tubing called for in 1998 was rejected due to a problem with a component material. When Stolt did not receive the 1998 delivery, it asked other potential suppliers, including Quality Tubing, to bid on providing the tubing due in 1999 under the Stolt Contract. However, Precision–US and Stolt have not canceled the Stolt Contract. On September 22, 1998, Stolt faxed Denis Dunlap, of Precision–US, and Mick Ackers, of Precision–UK, a "Letter of Intent" to "Precision Tube Technology" concerning the 1999 portion of the Stolt Contract. The letter proposed a "final amendment to [the original contract] . . ." and stated that delivery "shall be in accordance with Terms and Conditions as specified in [the original contract] unless otherwise agreed in the Amendment to the Contract." (Docket Entry No. 28, Ex. A). On September 22, 1998, Larry Smith, president of both Precision–US and Precision–UK, accepted the letter of intent. (Docket Entry No. 28, Ex. C).[4]

---

**3.** Quality Tubing claims that Precision–UK was to manufacture and supply the tubing; Precision Tube claims that the manufacturer was not specified in the Contract.

**4.** Although the parties have not executed a written agreement to make Precision–UK the contract payee and contractor, in place of Precision–US, Precision Tube asserts that

Quality Tubing seeks a preliminary injunction against defendants' manufacture in Scotland of coiled tubing for the 1999 and 2000 deliveries under the Stolt Contract, for delivery and use abroad. Quality Tubing asserts that the execution of the Stolt Contract itself constitutes a sale or offer for sale within the United States that infringes the '091 and '911 patents. Quality Tubing also alleges breach of its license agreement with Precision–US, asserting that by entering into the license agreement governing the sale of coiled tubing covered by the '091 and '911 patents manufactured in the United States, Precision–US entered into an implied covenant to refrain from offering for sale, or selling, coiled tubing manufactured abroad.[5]

Precision Tube has moved to dismiss or for summary judgment on the basis that, as a matter of law, "a U.S. patent can[not] be infringed by sale of goods which are or will be manufactured outside the United States, shipped outside the United States to a customer outside the United States for use outside the United States, the goods never entering the United States." (Docket Entry No. 12, p. 1). As to Quality Tubing's breach of license claim, Precision Tube asserts that the license permits Precision–US to make in the United States coiled tubing covered by the '091 and '911 patents, for sale and use anywhere in the world. Precision Tube emphasizes that Texas law disfavors implied covenants and that nothing in the license forbids Precision Tube from selling or offering to sell coiled tubing manufactured abroad, even if

that tubing is covered by one or more claims of the '091 or '911 patents.

The arguments are examined below.

## II. The Applicable Legal Standards

### A. The Standard for a Preliminary Injunction

Quality Tubing must establish four elements for preliminary injunctive relief:

(1) a substantial likelihood that a plaintiff will prevail on the merits, (2) a substantial threat that irreparable injury will result if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to the defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

*Systemation, Inc. v. Engel Indus., Inc.,* 194 F.3d 1331, 1999 WL 129640, at *2 (Fed.Cir. Mar. 10, 1999) (unpublished opinion); *Novo Nordisk A/S v. Eli Lilly and Co.,* 185 F.3d 884, 1999 WL 96413, at *3 (Fed.Cir. Feb. 23, 1999) (unpublished opinion); *Mikohn Gaming Corp. v. Acres Gaming, Inc.,* 165 F.3d 891, 894 n. 3 (Fed. Cir.1998) ("Because the issuance of an injunction pursuant to this section enjoins 'the violation of any right secured by a patent, on such terms as the court deems reasonable,' a preliminary injunction of this type, although a procedural matter, involves substantive matters unique to patent law and, therefore, is governed by the law of this court. We recognize, however, that purely procedural questions involving the grant of a preliminary injunction are controlled by the law of the appropriate

---

during a December 18, 1998 meeting among Precision–US, Precision–UK, Stolt, and a company named Statoil, held in Peterhead, Scotland, Stolt "acknowledged that Precision–UK should have been identified as the payee under the Stolt Contract." (Docket Entry No. 28, p. 5; Ex. B, Declaration of Smith). Precision Tube argues that the payee was verbally changed during this meeting. Quality Tubing disputes that any change is effective. This dispute is not material to the issue before this court. It is undisputed that the Stolt Contract was negotiated and executed by a United States company, in the United

States. (Docket Entry No. 18, Joint Statement of Uncontested Facts, ¶¶ 1–15).

**5.** Quality Tubing sued Precision–UK in Scotland for infringement of Quality Tubing's British patent that is the counterpart to the '091 patent. The record before this court indicates that the lawsuit is still pending before the court in Scotland. Quality Tubing also sued Precision–US in state court for breach of the license agreement. The record indicates that the breach of license lawsuit, filed in the state district court in Harris County, Texas, is pending.

regional circuit.") (quoting *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 n. 12 (1988)); *Rodriguez v. United States*, 66 F.3d 95, 97 (5th Cir.1995).

### B. The Summary Judgment Standard[6]

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fᴇᴅ.R.Cɪᴠ.P. 56. Under Fᴇᴅ.R.Cɪᴠ.P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir.1994). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Id.* at 1075.

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.1995). The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Little*, 37 F.3d at 1075 (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548). In deciding a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Little*, 37 F.3d at 1075 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548).

### III. Quality Tubing's Patent Infringement Claims

35 U.S.C. § 271(a) provides:

Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271(g) states:

... whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer....

 The United States patent laws apply within the United States and have no extraterritorial effect. *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 531, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972). It is not an act of patent infringement to make or use a patented product outside the United States. *Id.* at 527, 92 S.Ct. 1700.

In 1988, Congress enacted the Process Patent Amendments Act, Pub.L. No. 100–418, §§ 9001–07. The Act, codified as section 271(g), made it an act of infringement to import, sell, or use in this country a product made abroad by a process protected by a United States patent. *See Eli Lilly and Co. v. American Cyanamid Co.*, 82 F.3d 1568, 1571 (Fed.Cir.1996). The 1988 Act

was enacted to close a perceived loophole in the statutory scheme for protect-

---

6. Precision Tube filed the motion for summary judgment in the alternative to the motion to dismiss. The parties submitted materials outside the pleadings. At the hearing on February 1, 1999, this court ruled that it would treat the motion to dismiss as one for summary judgment.

ing owners of United States patents. Prior to the enactment of the 1988 statute, a patentee holding a process patent could sue for infringement if others used the process in this country, but had no cause of action if such persons used the patented process abroad to manufacture products, and then imported, used, or sold the products in this country.... By enacting the Process Patent Amendments Act, ... Congress changed the law by making it an act of infringement to import into the United States, or to sell or use within the United States "a product which is made by a process patented in the United States ... if the importation, sale, or use of the product occurs during the term of such process patent."

*Id.* at 1571–72. The legislative history states that section 271(g) was intended to "provide that issuance of a process patent includes the right to exclude others from using or selling in the U.S., or importing into the U.S. products made by that process." Pub.L. 100–418, p. 2118.

In 1994, Congress amended the patent laws to add "offer to sell" to the existing list of infringing activities. The expanded law became effective on January 1, 1996. *See* Uruguay Round Agreements Act, Pub.L. No. 103–465, § 533(a)(1), 108 Stat. 4809, 4988 (1994). Section 271(i) defines an "offer to sell" covered by the statute as "that in which the sale will occur before the expiration of the term of the patent." In *3D Systems, Inc. v. Aarotech Laboratories, Inc.,* 160 F.3d 1373 (Fed.Cir.1998), the Federal Circuit noted that the "amendment to § 271(a) represents a distinct change to the bases for patent infringement, because liability arose previously only as the result of an actual sale." *Id.* at 1378 (citing *Telectronics Pacing Sys., Inc. v. Ventritex, Inc.,* 982 F.2d 1520, 1523

(Fed.Cir.1992)). The *3D Systems* court also noted that "[l]ittle interpretation of this change as it related to direct infringement under § 271(a) has been given." *Id.* Congress also added the "offer to sell" language to section 271(g).

The issue is whether Precision Tube has shown as a matter of law that by executing the Stolt Contract, it did not commit an act of infringement by selling a patented product within the United States or by offering to sell a patented product within the United States, under sections 271(a) and 271(g). Precision Tube contends that the undisputed facts show that, as a matter of law, no infringing sale or offer for sale occurred in the United States for coiled tubing that was to be made, delivered, and used outside this country. Quality Tubing does not base its claim on an allegation that under the Stolt Contract, defendants will make, import, or use infringing products in the United States. Rather, Quality Tubing asserts that "through the executed [Stolt] contract," Precision Tube sold the patented invention in the United States or offered to sell the patented invention in the United States. (Docket Entry No. 19, p. 7). Quality Tubing asks this court to enjoin manufacture in Scotland under the Stolt Contract because it was negotiated and executed in the United States, by a United States company. "[A] mere sales transaction that occurs in the United States *can* give rise to infringement liability." (Docket Entry No. 19, p. 4).

### A. Infringement by Sale

The sale of a patented product must occur in the United States before the patent laws can apply; sales in foreign markets are outside the territorial jurisdiction of the United States patent laws.[7] Precision Tube cites *Fausett v. Pansy Ellen Inc.,* 1990 WL 314092, 19 U.S.P.Q. 1228

---

7. Precision Tube cites *Automotive Products PLC v. Tilton Engineering Inc.,* 33 U.S.P.Q.2d 1065, 855 F.Supp. 1101 (C.D.Cal.1994) for the proposition that United States patent laws do not exclude sales in foreign markets, because "direct infringement requires sales 'within the bounds of this country.'" *Id.* 33

U.S.P.Q.2d at 1075, 855 F.Supp. 1101 (quoting *Deepsouth,* 406 U.S. at 527, 92 S.Ct. 1700). Precision Tube cites *Dowagiac Manufacturing Co. v. Minnesota Moline Plow Co.,* 235 U.S. 641, 35 S.Ct. 221, 59 L.Ed. 398 (1915), and *Robotic Vision Systems v. View*

(N.D.Ga.1990), for the proposition that "sales" abroad by United States companies do not violate the United States patent laws. In *Fausett*, the defendant stored allegedly infringing products in the United States, then shipped the products to a foreign country. The court found that this activity did not violate the United States patent laws, which do not prohibit the storage of infringing products within the United States. The court noted that extending the patent laws to cover such activity would impose liability on American companies for activity that would not be covered if those companies had headquarters and warehouses outside the United States: "The Court is not aware of any reason American companies should labor under this type of competitive disadvantage. Likewise, the Court sees no basis for adopting a construction of the patent laws that would encourage American companies to relocate abroad." *Id.* at 1230.

In *Fausett*, the plaintiff did not allege the formation and execution of a contract in the United States, but merely the storage of infringing products in the United States. Similarly, in *Dowagiac Manufacturing Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641, 35 S.Ct. 221, 59 L.Ed. 398 (1915), the court addressed whether the sales transaction took place within the United States or outside its territorial boundaries. However, the sales transaction at issue was not, as here, the negotiation and execution of a contract to manufacture and sell, but rather physical delivery to the purchasers, the "selling ... after [the products] passed out of the makers' hands." *Dowagiac*, 235 U.S. at 650, 35 S.Ct. 221.

Quality Tubing asserts that in this case, where the contract negotiations and execution occurred in the United States, the contract itself constitutes a "sale" within the United States. Precision Tube argues

*Engineering, Inc.*, 39 U.S.P.Q.2d 1117 (C.D.Cal.1995) to support the assertion that it is not patent infringement to sell patented products outside the United States.

that a sale is not merely where the agreement takes place; the patent law requires that the offending product have physically entered the United States. The dispute centers on the definition of "sale," which is not defined in the patent statute.

In *North American Philips v. American Vending Sales, Inc.*, 35 F.3d 1576 (Fed. Cir.1994), the issue was whether the district court had personal jurisdiction under the state long-arm statute; the site of the tort depended on where the sale of the infringing product occurred. The court stated that "it is possible to define the situs of the tort of infringement-by-sale either in real terms as including the location of the seller and the buyer and perhaps the points along the shipment route in between, or in formal terms as the single point at which some legally operative act took place, such as the place where the sales transaction would be deemed to have occurred as a matter of commercial law." *Id.* at 1579. The court rejected the test that looks only to the place "where legal title passes rather than the more familiar places of contracting and performance." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). In *North American*, the court cited the Supreme Court's cautionary statement in *Burger King Corp. v. Rudzewicz*:

> The Court long ago rejected the notion that personal jurisdiction might turn on "mechanical" tests, or on "conceptualistic ... theories...." Instead, we have emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences [that] are the real object of the ... transaction."

*Id.* at 1579 (quoting *Burger King*, 471 U.S. at 478–79, 105 S.Ct. 2174).[8]

8. Although these cases involve issues of personal jurisdiction, that does not make them inapplicable. In *North American*, the court explicitly stated that the "tort alleged in this case exists solely by virtue of federal statute,

This court concludes that a careful reading of the precedents supports Precision Tube's argument that the negotiation and execution of the Stolt Contract did not constitute a sale in the United States. In the case law, a "sale" presupposes not merely an agreement to sell, but performance of that agreement. In *North American,* the place of negotiation and execution of the contract was not at issue. The issue was whether the place of delivery of the contracted-for items was the place of the sale. In *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558 (Fed.Cir.1994), the defendants had shipped the allegedly infringing product to Virginia, where the product was sold. The Federal Circuit stated that the "situs of the injury is the location, or locations, at which the infringing activity directly impacts on the interests of the patentee, here the place of the infringing sales in Virginia." *Id.* at 1571.

In *Ecodyne Corp. v. Croll–Reynolds Engineering Co., Inc.,* 491 F.Supp. 194 (D.Conn.1979), the district court looked to the common law definition of "sale" to decide whether patent infringement had occurred. The court stated:

> It is well understood that delivery of the property is one of the elements of a sale, *Norfolk and W R Co. v. Sims,* 191 U.S. 441, 447, 24 S.Ct. 151, 48 L.Ed. 254 (1903), and "the transfer of the property in the thing is effected by the transfer of the thing itself to the purchaser." *Stevens v. Gifford,* 137 Pa. 219, 20 A. 542, 543 (1890). In sum, a sale is an executed contract, to constitute which delivery in fact or in law is indispensable, and it cannot be given of a thing which has not fully come into existence. *Clemens v. Davis,* 7 Pa. (7 Barr) 263, 264 (1847); *see also Pabst Brewing Co. v. Commonwealth,* 32 Ky.Law Rep. 1010, 107 S.W. 728, 729 (1908)....

and defining its contours inevitably entails the construction of the [patent] statute—not the [ ] long-arm statute." *Id.* at 1579. The court addressed the question of where a sale occurs under section 271(a) of the patent statute, the issue present here.

Clearly, then, by whatever definition, possession of the thing itself, or the immediate right to its possession ... is a necessary component of a "delivery", which is itself a necessary component of a sale.

*Id.* at 197.

The negotiation and execution of a contract to sell is not, standing alone, a sale that is an act of infringement under section 271(a) and (g). The cases also require performance. In this case, Precision–US and Stolt negotiated and executed the Stolt Contract in the United States. No delivery of tubing, no invoicing, and no payment has occurred. (Docket Entry No. 28, Joint Statement of Uncontested Facts, ¶ 18). The contract performance that Quality Tubing alleges as infringing is the proposed manufacture of coiled tubing outside the United States, for delivery and use outside the United States. The performance that Quality Tubing seeks to enjoin involves manufacture, delivery, and use entirely outside of the United States.

There was a contract to sell executed in the United States, but the execution of that contract did not in itself constitute a sale in violation of the patent statutes. Precision Tube's motion for summary judgment as to Quality Tubing's allegation of infringement by sale under sections 271(a) and (g) is GRANTED.[9] Because there can be no contributory infringement without direct infringement, Precision Tube's motion for summary judgment as to Quality Tubing's allegations of indirect liability under those same sections is also GRANTED.

**B. Infringement by Offering to Sell**

Quality Tubing contends that the negotiation and execution of the Stolt Contract in Houston constitute an offer to sell an in-

9. The analysis under sections 271(a) and 271(g) is the same.

fringing product, covered by the 1994 amendments to sections 271(a) and (g). Quality Tubing asserts that an offer made in the United States to sell outside the United States is an act of infringement. Precision Tube reads the statute to require an offer to sell within the United States; both the offer and the sale it contemplates must be within the United States to avoid giving extraterritorial effect to American patent law.

There is scant case law construing the "offer to sell" language. There is no case law examining the precise issue before this court. The two decisions most closely on point are *3D Systems, Inc. v. Aarotech Laboratories, Inc.*, 160 F.3d 1373 (Fed.Cir. 1998), and *Rotec Industries, Inc. v. Mitsubishi Corp.*, 36 F.Supp.2d 810 (C.D.Ill. 1998).

In *3D Systems*, the patents at issue involved stereolithography equipment, which produces three-dimensional prototype models of products during design and development. Plaintiff alleged that the defendants, headquartered in Virginia, sent letters to companies in California, quoting prices for the sale of allegedly infringing equipment. Plaintiff claimed that by sending the letters, defendants infringed the patent by making an offer to sell the patented equipment; no actual sale took place. 160 F.3d at 1378. The question before the court was whether California could exercise specific personal jurisdiction over the defendants. To determine whether the cause of action for infringement arose out of, or was directly related to, the activities directed at California, the court had to decide whether defendants had made an offer to sell the allegedly infringing products. The Federal Circuit stated that the "offer to sell" language "represents a distinct change to the bases for patent infringement, because liability arose previously only as the result of an actual sale." *Id.* The court described the purpose behind the "offer to sell" language:

One of the purposes of adding "offer[ ] to sell" to § 271(a) was to prevent exactly the type of activity [defendant] has engaged in, i.e., generating interest in a

potential infringing product to the commercial detriment of the rightful patentee.

*Id.* at 1379. The court found that "[a]s a matter of federal statutory construction, the price quotation letters can be regarded as 'offer[s] to sell' under § 271 based on the substance conveyed in the letters, i.e., a description of the allegedly infringing merchandise and the price at which it can be purchased." *Id.* The court concluded that by sending the price quotation letters to California, the defendants had made an infringing offer to sell in California.

In *Rotec*, the plaintiff was the assignee of a patent for "tower crane supported articulated concrete conveyor belt systems." 36 F.Supp.2d at 811. Defendants began designing allegedly infringing components in Oregon to respond to a request for bid from the Chinese government for a dam construction project in China. *Id.* at 814. Defendants submitted a bid proposal and negotiated with the Chinese government for almost a year before signing a contract in China. *Id.* at 814–15. All parts were manufactured, delivered, and used abroad; no manufacturing took place in the United States and no goods were imported into the United States. *Id.* at 815. Plaintiff asserted that the contract negotiations that had occurred in the United States constituted an "offer to sell" and sued defendants for, among other things, patent infringement.

In arguing that the contract negotiations between defendants and the Chinese government were an infringing offer to sell, plaintiff asserted that " 'substantial activity prefatory' " to the contract occurred in the United States. *Id.* at 815. Plaintiff derived the "substantial activity prefatory" language from cases involving the section 102(b) "on-sale" bar. The court rejected plaintiff's argument because the Federal Circuit in *3D Systems* "declined to import the authority construing the 'on sale' language of 35 U.S.C. § 102(b) into the 'offer to sell' provision of § 271(a)." *Id.* at 817 (citing *3D Systems*, 160 F.3d at 1379 n. 4).

The court then analyzed whether defendants had made an infringing offer to sell in the United States. Plaintiff argued that the *3D Systems* case "supports its position" that the bid proposal originated in the United States: the defendants "were located in the United States, pricing information was prepared in the United States, and the proposal for the sale of the conveyor components was finalized by [one defendant] in the United States." *Id.* at 817. The court rejected plaintiff's argument and concluded that the defendants had not made an offer to sell within the United States. The bid proposal was finalized in Hong Kong and presented in China; the negotiations with the Chinese government occurred in China; and the contract was signed in China. *Id.* "The uncontradicted evidence shows that the actual 'offer to sell,' including the description of the product and the proposed price . . . was made in China." *Id.* (citation omitted).

The court in *Rotec* did not reach the issue of whether patent infringement under the "offer to sell" language requires that both the offer and the sale it contemplates occur in the United States. The court simply found that, based on the facts before it, the defendants did not make any offer in the United States to sell. *Rotec* did not address the issue before this court: whether an offer made in the United States to sell products manufactured and delivered outside the United States violates the United States patent laws.

The legislative history provides insignificant guidance on this issue. The Senate history simply states that the "list of exclusive rights granted to patent owners is expanded to preclude others from offering to sell or importing products covered by a U.S. patent or offering to sell the products of patented processes," S.Rep. 103–412. The House history states that it "amends the definition of infringing activity to include offers for sale and importation of a patented good." H.R.Rep. 103–826(I).

Because the case law and the legislative history do not directly speak to the issue to be decided by this court, the parties have argued their positions largely based on the impact of the competing statutory constructions. Quality Tubing asserts that Precision Tube's reading of the statute adds a requirement of "intent" and makes the "offer to sell" language meaningless. Precision Tube disputes the assertion that its interpretation adds an "intent" element and argues that basing liability on an offer to sell requires the contemplated sale to be potentially infringing. Precision Tube attacks Quality Tubing's reading of the statute as requiring the court to expand the reach of the United States patent laws into foreign markets, placing an unfair burden on United States companies in competing with companies that have foreign plants.

The secondary sources echo these arguments. As one commentator has noted, "to prohibit [a] hypothetical N.Y. businessman from making the phone call [to sell a German manufactured widget to an Australian customer] is to regulate engagement in the legal act of foreign manufacturing and selling of a U.S. patented product. . . . The U.S. patent holder would, in effect, obtain international exclusive rights vis a vis American based businesses." Edwin D. Garleep, *An Analysis of the Patentee's New Exclusive Right to "Offer to Sell,"* 81 J.Pat. & Trademark Off. Soc'y 315, 326 (1999). *Chisum on Patents* notes that the "offer to sell" language "extends the scope of a patentee's rights to unauthorized promotional activities that fall short of actual sale, making or use." 5 Donald S. Chisum, Chisum on Patents § 16.02[1], at 16–9 (1998).

The language of the statute and the cases make it clear that expanding the list of infringing activities in sections 271(a) and (g) to include an "offer to sell" rather than merely a "sale" protects a patent holder at an earlier stage of infringing activity. The patent holder no longer has to wait for an actual infringing sale before filing suit. Rather, the patent holder can sue its competitor for infringement at an earlier stage, when there is an offer to

make an infringing sale. However, the expansion of the statute to include the earlier stage of an infringing activity, the offer to sell as well as the actual sale, means that the sale for which the offer is made must itself be an act of infringement. If it were sufficient to have an offer, in the United States, to sell in a foreign country, the sale offered would not be an act of infringement, and the offer to sell would not be an earlier stage of an infringing activity.

Section 271(i), added to the patent laws in 1996 with the "offer to sell" language, supports this conclusion. It defines an "offer to sell" as "that in which the sale will occur before the expiration of the patent." 35 U.S.C. § 271(i). This definition makes it clear that Congress intended the "offer to sell" language to push back the point in time at which the competitor's activity is an act of infringement. Section 271(i) contemplates that an infringing sale will occur, but does not require that the patent holder wait for the sale before suing for patent infringement.[10] *Cf. Finnsugar Bioproducts, Inc. v. Raytheon Eng'rs & Constructors*, No. 97–C–8746, 1998 WL 703463, at *3 (N.D.Ill. Sept. 30, 1998) ("The text of § 271(i) makes it clear that the term 'offer to sell' contemplates a sale or use of the infringing apparatus at some future date. Therefore, the inclusion of the 'offer to sell' language in § 271(a) and (c) contemplates a violation prior to the use or sale. § 271(i) now allows a plaintiff to bring a claim under § 271(c) under the

new language of 'offer to sell' and meet the direct infringement pleading requirement by pleading that a sale will occur sometime in the future."). Because a sale is infringing only if it occurs within the United States, an offer to sell is not infringement unless the contemplated sale is to occur in the United States.[11]

Quality Tubing asserts that this approach would frustrate the newly added "offer to sell" language because it would require proof that the defendant intended to manufacture the infringing product in the United States or import the infringing product into the United States before the offer to sell would be actionable; it would require a defendant making an offer to sell a product covered by a United States patent to have formed an intent as to the place of manufacture or delivery before the defendant could be held liable under the "offer to sell" language. However, requiring that an infringing offer be for a sale within the United States does not add an element of intent, any more than requiring that an offer be for a sale within the term of the patent. Both determinations require a court to look at the facts concerning the contemplated sale itself, not merely the offer standing alone. Examining the facts surrounding the contemplated sale does not add an improper intent element or make the "offer to sell" provision of sections 271(a) and (g) meaningless. It requires a determination as to whether the sale offered will potentially infringe a United States patent. Such a

**10.** In *Lifting Technologies, Inc. v. Dixon Industries, Inc.*, No. cv–96–68–M–CCL, 1996 WL 653391 (D.Mont. Aug. 27, 1996), the district court rejected the argument that section 271(i) requires an actual sale. "The 'sale' of an infringing device has long constituted an infringement. If an 'offer for sale' required a 'sale' to constitute infringement, the specific 1996 amendment to the statute would have effected no change." *Id.* at *3. The analysis in *Lifting Technologies* does not affect this court's analysis. The court did, however, note that the purpose behind section 271(i) was to allow offers to occur before the patent expires, so long as the competitor specifies that the infringing product will not be made available until after the patent expires. The

court stated that the legislature "merely expressed its decision to prevent that unwanted side effect of amending the statute to make an offer for sale an infringement." *Id.* This analysis of section 271(i) supports this court's conclusion that an offer to sell is infringing only if the sale it contemplates would also be infringing.

**11.** The court in *3D Systems* articulated the same rationale that applies here: "One of the purposes of adding 'offer[ ] to sell' to § 271(a) was to prevent exactly the type of activity [the defendant] has engaged in, *i.e.*, generating interest in a *potential infringing* product to the commercial detriment of the rightful patentee." 160 F.3d at 1379 (emphasis added).

construction avoids confusion over whether an offer to sell a product in a foreign market, made during an international telephone call or in an electronic mail transmission, or in a letter mailed in or faxed in the United States, is an act of infringement.

This construction does not expand the territorial jurisdiction of the United States patent laws and does not inhibit the ability of American companies to compete abroad. *See Deepsouth,* 406 U.S. at 531, 92 S.Ct. 1700 ("[W]e note that what is at stake here is the right of American companies to compete with an American patent holder in foreign markets. Our patent system makes no claim to extraterritorial effect ... and we correspondingly reject the claims of others to such control over our markets. To the degree that the inventor needs protection in markets other than those of this country, the wording of 35 U.S.C. §§ 154 and 271 reveals a congressional intent to have his seek it abroad through patents secured in countries where his goods are being used."). "A reading that requires only that an offer be within the United States to infringe § 271(a) may be an impermissible expansion of the territorial scope of U.S. patent laws." Garleep, *supra,* at 326. The reading Quality Tubing advocates "would [ ] place a burden on American businesses that would not exist for foreign competitors, [and that] courts are sensitive to such competitive burdens." Garleep, *supra,* at 326–27.

Taking the undisputed summary judgment evidence in the light most favorable to the nonmovant, this court finds that Precision Tube has, as a matter of law, committed no act of infringement under section 271(a) or (g) by contracting, in the United States, to manufacture, sell, and deliver a product in Scotland and Norway, for use in Norway. Defendants' motion for summary judgment is GRANTED.

## IV. Quality Tubing's Breach of License Claim

Quality Tubing alleges that Precision Tube breached the 1992 license agreement by selling or offering for sale, within the United States, patented tubing manufactured outside the United States. Precision Tube responds that "[t]he license agreement contains no undertaking by Precision–US that it will refrain from selling foreign-manufactured goods, either in the United States or abroad." (Docket Entry No. 20, p. 8).

The parties agree that the license agreement is governed by Texas law. Quality Tubing's breach of license claim will be resolved under Texas law. *See Chavez v. Arte Publico Press,* 139 F.3d 504, 510 (5th Cir.1998), *vacated on other grounds,* 180 F.3d 674 (5th Cir.1999); *McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d 917, 922 (Fed. Cir.1995). Precision Tube has informed this court that there is already litigation pending in the Texas state court involving this license agreement. (Docket Entry No. 12, p. 16). By granting summary judgment for Precision Tube on Quality Tubing's patent infringement claim, this court has dismissed the only claim that supports federal jurisdiction. "Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction if the district court has dismissed all claims over which it has original jurisdiction." *Smith v. Texas Children's Hosp.,* 172 F.3d 923, 926 n. 5 (5th Cir.1999); *see also Bass v. Parkwood Hosp.,* 180 F.3d 234, 246 (5th Cir.1999); *Rotec,* 36 F.Supp.2d at 818 (quoting *Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 727 (7th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 167, 142 L.Ed.2d 136 (1998)).

In *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) and *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court outlined the relevant factors a district court must consider in deciding whether to exercise its discretion to decide the state law claims. Those factors include a balancing of judicial economy, convenience, fairness, and comity. *See Ba-*

*tiste v. Island Records, Inc.,* 179 F.3d 217, 227 (5th Cir.1999) ("We must ... consider both the statutory provisions of 28 U.S.C. § 1367(c) and the balance of the relevant factors of judicial economy, convenience, fairness, and comity that the Supreme Court outlined.").

In this case, the issue of whether the license agreement, allowing Precision Tube to manufacture patented coiled tubing in the United States to sell in or out of this country, includes an agreement not to manufacture coiled tubing covered by the '091 and '911 patents outside the United States, is an issue of state law. The record before this court indicates that the terms and interpretation of the license agreement between these parties is the subject of ongoing litigation in state court. The interests of judicial efficiency, economy, and comity all weigh in favor of dismissing the state law claim without prejudice.

Quality Tubing's breach of license cause of action is DISMISSED without PREJUDICE.

## V. Conclusion

Precision Tube's motion for summary judgment as to Quality Tubing's patent infringement claims is GRANTED. Quality Tubing's application for a preliminary injunction is DENIED. Quality Tubing's breach of license claim is DISMISSED without PREJUDICE.