**NATARE CORPORATION, Plaintiff,**

v.

**AQUATIC RENOVATION SYSTEMS, INC., d/b/a A.R.S., Inc., and Stewart J."Jason" Mart, Defendant.**

**No. IP 95–145–C–B/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

May 26, 2000.

Dwight D. Lueck, Barnes & Thornburg, Indianapolis, IN, for Plaintiff.

Michael L. Einterz, Indianapolis, IN, for Defendant

### *ENTRY DENYING PLAINTIFF'S MOTION FOR SANCTIONS*

BARKER, Chief Judge.

On December 4, 1997, we held that the parties in this case were bound by a settle-

ment agreement reached on May 15, 1997.[1] Pursuant to that ruling, on January 7, 1998 we entered an Order of Judgment that incorporated the terms of the agreement. In November of 1998 we denied a motion of Defendants, Aquatic Renovation Systems, Inc. (d/b/a A.R.S., Inc., and as "RenoSys") and Stewart J. "Jason" Mart (collectively, "ARS") for sanctions for contempt of the Court's Order against Plaintiff Natare Corporation ("Natare") alleging that Natare violated the terms of the agreement as set forth in the Order of Judgment. Now Natare has filed its own motion for civil contempt sanctions against ARS, claiming that ARS violated the Order by infringing Natare's patent. After full consideration of the parties' briefs and the arguments and evidence presented on May 10, 2000, we *DENY* Natare's motion for the reasons discussed below.

### Factual Background

Natare and ARS are fierce competitors in the swimming pool installation and rehabilitation industry. The lawsuit that gave rise to the settlement agreement incorporated in the Order of Judgment at issue concerned Natare's patented method for installing swimming pool liners (the " '294 patent"). In the Order, we compelled the parties to adhere to an agreement they had reached in settlement of Natare's claim that ARS had been infringing the '294 patent and ARS' counter-claim that the patent was invalid. As one of the terms, ARS, its "officers, agents, servants, employees and attorneys, and those in active concert or participation with them" were "permanently enjoined from infringing the '294 patent, inducing others to infringe the '294 patent, or contributorily infringing the '294 patent."

ARS now offers a method (the "RenoSys method") similar to the '294 patented method of installing pool liners that Na-

tare agrees does *not* infringe its patent. In addition, ARS offers a completely different and less expensive method (the "104–L method").

Last December, a Natare salesperson furnished information and plans regarding its pool liner system, including the '294 patent method of installation, to Brian Meyer, the Aquatic and Fitness Director of the Rolling Meadows Park District in Rolling Meadows, Illinois (the "Park District"). Meyer needed to refurbish an older pool (the "Plum Grove" pool) owned by the Park District, but lacked the engineering or design resources to plan the project. Among the promotional materials Natare furnished to Meyer was a set of project specifications ("section 13850") suitable for use in a bid solicitation. *See* Pl.'s Ex. 1. Meyer prepared a request for bids package for the Plum Grove pool project[2] incorporating section 13850, which includes the following language:

Part 2: Products

2.01 Manufacturers

All base bids are to include the Natatec Swimming Pool Membrane System which is a proprietary product of Natare Corporation, located in Indianapolis, Indiana, and the characteristics and standards listed herein. Bids for substitute PVC membrane systems, proven in commercial and public pool applications, are encouraged. All bids shall include the base bid system and a deductive alternate for the substitution.

The rest of Part 2 lists chemical and physical properties of the components and equipment to be used. The third part of section 13850, "Execution," subsection 3.01–J, describes a method of pool liner termination that is identical to the '294 patented method and states: "Only those systems that incorporate the termination method described above will be accept-

---

1. *See Natare Corp. v. Aquatic Renovation Sys. Inc.,* 987 F.Supp. 695, 697–99 (S.D.Ind.1997).

2. There is no evidence that Meyer was required to get approval for anything, including the materials or installation method, specified in the bid request; the decisions fell to him alone.

able." However, this subsection does not indicate that the termination method specified is a patented method owned by Natare. Section 13850 contains no mention of the '294 patent and the sole reference to the proprietary nature of Natare's system is found as quoted above in subsection 2.01.

Meyer testified that he did not know the pool liner termination method was patented when he included the specifications calling for its use in the Park District's bid solicitation. Natare claims its patent for the method was clearly indicated on "other" promotional materials it had furnished to Meyer along with section 13850.

After ARS received the Plum Grove bid solicitation packet, it recognized the termination method specified therein as belonging to Natare. Steve Draughon, an ARS salesman, contacted Meyer in accordance with the instructions in the Park District's bid packet [3] to explain that ARS could not bid to install the pool liner as specified because Natare owns the termination method designated in section 13850 of the Park District's request for bids. Draughon sent a fax to Meyer explaining that ARS could not submit a bid including the Natare '294 method due to the background of litigation but that ARS could use its comparable, non-infringing RenoSys system, a diagram of which he included in the fax. See Pl.'s Ex. 7. Meyer reviewed the RenoSys materials and assured Draughon that ARS would be permitted to bid on the project using the RenoSys system.

The Plum Grove project bid solicitation required potential bidders to visit the site before submitting a proposal. Draughon visited the Plum Grove pool on behalf of ARS, met with two Park District employees, promoted the RenoSys pool liner system, furnished them with another copy of the RenoSys pool liner termination detail and again demonstrated how ARS' termination method differs from Natare's. According to both Draughon and Meyer, the Park District understood the differences between Natare's and ARS' respective termination methods and requested that ARS submit a bid to do the project using its RenoSys method. Draughon asked the Park District to issue an Addendum to its bid solicitation packet to allow fair and competitive bidding on the project and Meyer did so in an effort to convey that the Park District would accept equivalent pool liner systems that performed as well as the one called for in the original packet. See Pl.'s Ex. 2. Addendum 2 altered the bid specifications by "correcting" section 13850 to read:

B. Part 2: Products

2.01 Manufacturers

The system specified is based solely upon the chemical and physical properties listed herein. The listed standards have been established as the minimum acceptable values for any membrane product to be offered on this project. Any membrane system meeting or exceeding the performance characteristics and application experience qualifications listed will be considered. As all aspects and equipment within the pool system have been designed to utilize the membrane principle, products not meeting the minimum requirements listed will not be accepted as that could adversely affect the performance of the system.

The Park District believed this Addendum opened the bidding to a performance basis because the termination method is part of

---

**3.** Page five of the Park District's bid materials provides that if a bidder finds "any discrepancies, omissions, ambiguities, or conflicts in or among the contract documents, or should be in doubt as to their meaning, he shall at once bring the questions to the attention of the Park District for answer and interpretation. The Park District will review the question and, where information sought is incorrectly shown or not clearly shown on the contract drawings or specifications, may issue an addendum to all bidders in which the interpretation will be made. All addenda to bidders are to be incorporated in the bids and will become a part of the contract documents. No oral interpretation by the Park district will be binding; only instruction in writing will be deemed valid."

a company's pool liner "system." Draughon and Meyer agreed that ARS could and would bid upon the Plum Grove project based upon the RenoSys system, using the RenoSys termination method as they had discussed, and that the system would be acceptable to the Park District on a performance basis.[4]

Only Natare and ARS bid on the Plum Grove project. *See* Pl.'s Exs. 1, 2. As provided for in the contract documents, ARS included two separate figures in its bid proposal and attached drawings detailing the second, less expensive alternate (the 104–L method). ARS submitted all of the required documents in accordance with the instructions, including the original bid solicitation that contained Natare's specifications in section 13850; ARS did not explicitly indicate that its base bid was based upon the RenoSys system. ARS's bid proposal did not specify that its installation method varied from the one described in section 13850. Likewise, Natare's bid contained no drawings or references to its patented method, what system or termination method it would use, or how the Natare system met the Park District's performance specifications. ARS' base bid to do the project (using the RenoSys system, including its own termination method) was lower than Natare's bid (based on *its* system, which uses the '294 patent method) and Meyer recommended to his supervisor, the District Superintendent, that Rolling Meadows accept ARS' bid. After the Park District awarded the project to ARS, Natare obtained the bid documents pursuant to the Freedom of Information Act and filed the instant motion.

## Legal Standard

■■■ To prevail on a motion for civil contempt, the movant must prove by "clear and convincing evidence" that the non-movant violated a court order. *Stotler and Co. v. Able*, 870 F.2d 1158, 1163 (7th Cir.1989); *see also Goluba v. School Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995).[5] The district court "must be able to point to a decree from the court 'which sets forth in specific detail an unequivocal command' which the party in contempt violated." *Stotler*, 870 F.2d at 1163 (citations omitted). The district court does not, however, "ordinarily have to find that the violation was 'willful'" and may find a party in civil contempt if that party "has not been 'reasonably diligent and energetic in attempting to accomplish what was ordered.'" *Id.* (citations omitted).

■■ Congress' amendment of 35 U.S.C. § 271, adding offers to sell to the list of behaviors constituting patent infringement, took effect in 1996. *See* 35 U.S.C. § 271(a) ("[W]hoever without authority makes, uses, **offers to sell**, or sells any patented invention, within the United States ... during the term of the patent therefor, infringes the patent.") (emphasis added). While courts have recognized the change in the law, not many have had an opportunity to construe the meaning of "offers to sell" under the amended statute and the legislative history provides little guidance. *See Quality Tubing, Inc. v. Precision Tube Holdings Corp.*, 75 F.Supp.2d 613, 621 (S.D.Tex.1999); *ESAB Group, Inc. v. Centricut, LLC*, 34 F.Supp.2d 323, 333 (D.S.C. 1999). In a case of first impression, the Court of Appeals for the Federal Circuit declared that federal, not state, law governs the determination of whether an "offer to sell" has occurred which would support a finding of patent infringement. *See 3D Systems, Inc., v. Aarotech Laboratories, Inc.*, 160 F.3d 1373, 1379 (Fed.Cir. 1998).

---

**4.** Meyer testified that he was responsible for deciding whether a proposed method met the performance requirements of the District.

**5.** When a "consent decree leads to contempt proceedings, [the Seventh Circuit] will leave

undisturbed the trial court's ruling ordering or denying contempt absent clear error or abuse of discretion." *Kindred v. Duckworth*, 9 F.3d 638, 641 (7th Cir.1993).

In *3D Systems*, the court declined to "exalt form over substance" in construing the statutory patent regime, reasoning that the purpose of the addition of the "offers to sell" language was to prevent "generating interest in a potential infringing product to the commercial detriment of the rightful patentee." 160 F.3d at 1379. The court defined an offer to sell simply as "a description of the allegedly infringing merchandise and the price at which it can be purchased" and found a price quotation letter was an offer to sell despite the letter's explicit disclaimer to the contrary. *Id.*

Subsequent cases discussing offers to sell under § 271(a) have applied federal statutory construction principles rather than state contract law, examining the facts and circumstances surrounding the communication alleged to constitute an "offer to sell" to determine whether a patent was infringed. *See HollyAnne Corp. v. TFT, Inc.*, 199 F.3d 1304, 1309 (Fed.Cir. 1999) (listing "facts that might indicate that [an offer to donate a patented invention] was actually an implied offer for sale, such as a discussion of prices, distribution of order forms for additional devices, or a gift offered as a trial or test in anticipation of a purchase"); *Cognitronics Imaging Sys., Inc. v. Recognition Research Inc.*, 83 F.Supp.2d 689, 695 (E.D.Va.2000) (holding Software Evaluation Agreement, "though not articulated in express offer and acceptance terminology, was in essence an offer to sell the allegedly infringing software" under § 271). *See also Quality Tubing*, 75 F.Supp.2d at 624 (determinations under § 271(a) "require a court to look at the facts concerning the contemplated sale itself, not merely the offer standing alone"); *Halmar Robicon Group Inc. v. Toshiba Int'l Corp.*, 53 U.S.P.Q.2d 1501, 1504 (W.D.Pa.1999) (examining facts of case where it appeared that offer of sale was embodied not only in price quotation "but also drawings and other technical information concerning the product" supplied on a different occasion).

## Discussion

Our January 7, 1998 Order of Judgment clearly reflects the terms of the parties' settlement agreement. By violating a term of the agreement, a party would be subject to civil contempt sanctions for disregarding an Order of the Court. However, Natare, as the party seeking to enforce the Order through civil contempt sanctions, has not proved by "clear and convincing" evidence that ARS infringed its '294 patent in violation of the Order.

To find that ARS infringed the patent, we would have to determine that it "offered to sell" the '294 patent invention.[6] We note that neither party presents any argument or case authority to guide us in interpreting the patent statute at issue, 35 U.S.C. § 271. There is nothing before us to even suggest that one who offers to perform a patented process, as opposed to offering to sell the rights to the patented process itself, has made an "offer to sell" a patented invention under § 271(a); our research reveals no case law on point and the parties have not raised the issue. Assuming that § 271(a) would apply to an offer to perform a patented process, Natare contends that "by knowingly soliciting work based on a representation that they could use the method covered by the '294 patent, ARS and Mart violated" the Order enjoining them from infringing the '294 patent. More specifically Natare alleges that, on its face, ARS' written response to the Park District's request for bids is an offer to install the pool liner using the '294 patent method. Natare's other allegation, that ARS used a "bait and switch" technique by offering to use the '294 patent method to get the bid and then offering a lower price on an alternate, non-infringing method, is not supported by the evidence;

---

**6.** Natare does not argue that ARS actually used the patented method and the evidence establishes that the opposite is true.

ARS clearly informed Meyer (the key Park District decision-maker regarding what methods would be acceptable for the project) that ARS could not use the '294 patent method before it submitted its bid. *See Beloit Corp. v. Valmet Corp.*, 44 U.S.P.Q.2d 1792 (W.D.Wis.1997) (discussing harm to patent holder from "bait and switch").

■ ARS' bid is an offer to perform the pool installation at a specific price. We must determine whether the services or products ARS offers in the bid include Natare's '294 patent method for liner termination. Natare's argument that we should consider only the bid documents rather than examining all the circumstances surrounding the offer cannot succeed because we do not rely on state contract law to determine if there was an infringing offer to sell. *See Halmar Robicon Group Inc. v. Toshiba Int'l Corp.*, 53 U.S.P.Q.2d 1501, 1504 (W.D.Pa.1999) (refusing to consider quote by itself in determining whether defendant offered to sell patented invention). An examination of the facts of this case, based upon the evidence presented at the hearing, reveals that ARS clearly did not offer to perform a pool installation using Natare's termination method and that ARS made it quite plain before submitting its bid that it could not and would not perform Natare's patented method. A conclusion that ARS infringed Natare's patent based on this evidence would be unfair and contradict the case law placing substance above form, just as it would be unfair to allow a defendant verbally to agree to sell a patented invention but avoid liability for infringement by drafting documents purporting to offer a non-infringing product.

The Park District's bid instructions require that the "bids shall be made on forms furnished by the Park District" and that "all applicable blank spaces on the 'Bid Proposal Form' must be fully filled in." Natare assembles various excerpts from these Park District materials to support its contention that ARS' bid was an offer to sell Natare's patented invention. Natare asserts that all bidders were required to submit offers on Park District forms that include specification section 13850 (and the '294 patented method) and contain a promise to complete the work as described therein; as a result, all who submitted a bid "offered to sell" Natare's patented invention. Even if we based our decision solely upon a reading of the offering documents themselves, we do not believe that, on their face, they constitute an offer by ARS to use the '294 patent.

It is true that subsection 3.02–J describes the process covered by the patented termination method and states that only systems using that method will be accepted, though the '294 patent is never mentioned in the document. The Bid Proposal Form (page seven) provides that the undersigned bidder

> hereby proposes to perform everything required to be performed and to furnish all labor, materials, tools, equipment and all services necessary to perform and complete in the satisfactory and workmanlike manner, all the work described herein all in accordance with said "contract documents."

Page four states "Oral bids or oral modifications to bids will not be considered." "Guarantees" on page 26 requires "all work to be performed under this contract" to be "constructed in compliance with the 'contract documents'" and a contractor guarantee that the "type, quality, design, and performance" on "all items or equipment to be incorporated in the completed project [ ] will fully meet the requirements of the contract specifications."

In addition to the provision that oral bids or modifications will not be considered, Natare cites "Coordination of Contract Documents," which states that all parts of the contract documents, including the Information for Bidders, Bid Proposal Form, Addenda, etc., "are intended to describe the complete work and are essential parts of the contract." Unfortunately for Natare, the section continues by adding

that the "Park District shall be permitted to make such corrections and interpretations as may be deemed necessary for the fulfillment of the intent of the contract documents," a privilege the Park District asserted by issuing Addendum 2, *supra.*

One possible understanding of Addendum 2 is that it applies only to Part 2 (Products) of the specifications and not to Part 3 (Execution) because it is a correction of a subsection of Part 2. However, Addendum 2 mentions application experience, which is found in Part 3. The Addendum language purports to permit consideration of any system meeting or exceeding the performance characteristics and application experience qualifications listed. It is unclear on the face of the document whether this Addendum is intended to modify just Part 2 or all of section 13850. Addendum 2 would be superfluous if it were intended to cover only Part 2, because the original paragraph indicates that bids for substitutes (for Natatec, Natare's proprietary system) are encouraged. Although not precisely drafted, the Addendum seems to be an attempt to set up performance standards, as Meyer testified. Even if it does not clearly specify what section it modifies, at the very least it renders the contract ambiguous, in which case it would be appropriate to consider extrinsic evidence to determine the parties' intent. In this case, the parties' intent as described by Meyer and Draughon and as embodied in the faxes they sent to each other could not be more obvious. *See* Pl.'s Ex. 7 and Def.'s Ex. D. It is undisputed that the contracting parties mutually understood that ARS would submit a base bid for its RenoSys system, not Natare's system.[7] Addendum 2 eliminates all refer-

ence to Natare's proprietary products in the bid documents and clearly indicates that any pool liner system will be accepted. In light of this Addendum, the "Installation and application" section (3.02–A.01) relied upon by Natare because it requires all work to be performed or directed by an authorized licensee of the system manufacturer actually supports ARS' position because it also states that the system manufacturer's bulletins take precedence over the specifications listed in section 13850. It would follow that bulletins from a different system manufacturer specifying a different termination method would govern under the terms of the bid proposal instead of section 13850.

We also note that the contract specifies in many places that the Park District has authority to interpret bids and decide what will meet its needs. On page six the Park District reserves the right at all times to "accept any bid or combination of bids in the best interest of the Park District and the right to waive minor deviations from the 'Contract Documents.'" "Authority of Owner" provides that the owner "shall decide all questions which arise as to the quality and acceptability of . . . manner of performance, . . . interpretation of the plans and specifications [and] acceptable fulfillment of the contract," while "Plans and Working Drawings" says that the Owner will furnish plans "and the finished work shall conform to the plans with the exception of such deviations as may be authorized by the Owner." A similar provision applies to the submission of "or equals"—exceptions to the rule that "[m]aterials, equipment, products and accessories for the 'Contract Base Bid' shall conform to *all* specifications herein."[8]

7. Natare argues that the last page of Draughon's fax to Meyer, a 1997 form letter that says "we will be bidding on this type of termination as per your specs however ..."shows that ARS submitted a bid offering to use the '294 method. However, the document is obviously an attempt to convince Meyer to choose the RenoSys method over Natare's: the fax's first page explains the patent situa-

tion, while the last page was included because it outlines the drawbacks of Natare's method.

8. *See* page eight: "Bidders 'or equal' materials, equipment, and accessories shall be shown in the 'Bidder's Materials, Equipment and Accessories Substitution Bid.' To be considered an 'or equal,' submittals must be accompanied by the manufacturer's shop drawings and specifications. The owner's decision

The evidence demonstrates that Meyer, acting as the Park District's agent, conceived the Plum Grove project and developed the bid solicitation package. Meyer decided what specifications to include in the bid request, and it appears that Meyer was the ultimate decision maker as to whether the District would accept a proposal that deviated from the specifications in section 13850. *See* Pl.'s Ex. 3 (letter from Meyer to Park District Superintendent recommending selection of ARS). It was Meyer's job to decide whether a proposed method was adequate and would perform as well as or better than the specifications in the bid packet. There is nothing to suggest that the Park District did not rely upon Meyer to screen the bids to ensure compliance with the performance specifications.

It would have been more precise (and avoided the cost of these proceedings) if ARS had submitted (for the third time) specifications for its own RenoSys system and attached them to the other materials it was required to submit with its bid, so that when Meyer's supervisor and any other potential decision makers for the project saw the bid they would immediately comprehend that ARS was *not* offering to use the exact method listed in section 13850. There is no evidence about the knowledge of Meyer's superiors regarding what system each company was offering. Neither the Bid Proposal page nor Addendum 2 asked bidders to attach documentation of the systems indicated in their base bids or for any details specifying the system components. That neither ARS nor Natare attached anything to their bid proposals to verify that their base bids would satisfy the performance requirements set forth by the Park District shows that it was either assumed, based upon discussions with the Park District, that the Park District knew exactly what their systems entailed or that Meyer made this determination in kind of a pre-screening process.

as to the quality, equality and merit of substi-

The bid packet allows for submission of alternates, that is, proposals that do not conform to the performance expectations set out in the packet. Natare misses the point in its argument that it is significant that ARS specifies only one alternate (the 104–L method) in its bid proposal instead of specifying the RenoSys method as well, because the alternate space is provided to explain non-base bid systems, while the RenoSys method meets all of the performance criteria (as does Natare's method) of the request for bids. A simple notation on the bid that ARS was not offering to use Natare's '294 patent might have prevented the instant controversy. But given the circumstances we cannot hold that ARS, by failing to specify what they were *not* offering, was not "reasonably diligent and energetic in attempting to accomplish what was ordered" by this Court.

We pause to note that if we had accepted Natare's claims that ARS infringed its patent, serious questions would have arisen as to Natare's culpability in the matter. Natare argues that the Park District's bid specifications "clearly require that bidding parties offer the patented swimming pool liner installation method." Pl.'s Rep. In Supp. Of Mot. For Sanctions at 1. Natare's president, Mr. Walsh, admitted that as a matter of course Natare tries to persuade buyers to include Natare's materials in their requests for bids but does not receive assurance that the materials in question will evidence Natare's ownership of the termination method. In this case, Natare's actions would have led to the infringement of its own patent because it induced a potential buyer to require other bidders unfamiliar with the patent to unwittingly offer to install a pool liner using the patented method. Natare's practice of persuading entities to use its specifications in their bid solicitations in effect prevents anyone except Natare or its licensees from bidding on the entities' projects. We caution Natare that courts will not allow a patent holder to misuse its patent by ex-

tution will be final."

panding its monopoly rights beyond the patent's lawful scope. *See* 6 Donald S. Chisum, *Chisum on Patents* § 19.04[3] (1997). Moreover, doctrines such as equitable estoppel, laches, and the finding of implied license have been applied to prevent patent holders from seeking relief from problems of their own making. *See Wang Lab., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1580–81 (Fed.Cir. 1997).

### Conclusion

Because we find that ARS did not "offer to sell" the Natare patented system, we find that ARS did not violate the Order of Judgment enjoining it from infringing Natare's patent. We therefore DENY Natare's Motion For Sanctions For Contempt of Court Order. The parties will bear their own costs and attorneys fees associated with the motion.