FIELDTURF INTERNATIONAL, INC., a Florida corporation; and Fieldturf Inc., a Canadian company, Plaintiffs,

v.

SPRINTURF, INC., a Pennsylvania corporation, et al., Defendants.

Sportfields LLC, a California Limited Liability Company; and Orion corporation, a California corporation, Counter–Complainants,

v.

Fieldturf International, Inc., a Florida corporation; and Fieldturf Inc., a Canadian company, Counter–Defendants.

No. CIVS–021409FCDKJM.

United States District Court, E.D. California.

March 25, 2004.

Alan Gail Perkins, Wilke, Fleury, Hoffelt, Gould & Birney, LLP, Sacramento, CA, for Plaintiffs.

Bradley D. Bosomworth, Sweeney Mason Wilson and Bosomworth, Los Gatos, CA, for Defendants.

Jacob D. Koering, Jody L. Factor, Factor and Partners LLC, Chicago, IL, Daniel L. Egan, Wilke, Fleury, Hoffelt, Gould & Birney, LLP, Sacramento, CA, for Plaintiffs and Counter Defendants.

Carla M. McCormack, McCormick Barstow Shepphard Wayte and Carruth, Fresno, CA, Timothy Patrick Grieve, Todd Michael Noonan, Stevens and O'Connell LLP, Sacramento, CA, Frederick A. Tecce, McShea Tecce, Philadelphia, PA, for Counter Claimants.

### MEMORANDUM AND ORDER

DAMRELL, District Judge.

This matter is before the court on (1) cross-motions for summary judgment on plaintiffs FieldTurf International, Inc. and FieldTurf Inc.'s (collectively, "FieldTurf") complaint against defendants SportFields LLC and Orion Corporation (collectively, "SportFields");[1] and (2) SportFields' motion for summary judgment on its counter-complaint against FieldTurf. On the cross-motions, SportFields seeks summary judgment, or in the alternative, summary adjudication of all four of FieldTurf's claims for relief against it; namely, FieldTurf's first and second claims for relief for patent infringement based upon a purported offer to supply an infringing product; FieldTurf's third claim for relief for intentional interference with prospective economic advantage ("IIPEA"); and FieldTurf's fourth claim for relief for unfair competition. FieldTurf cross-moves for summary adjudication as to its first and second claims for relief for patent infringement. SportFields additionally moves for summary judgment as to its counter-complaint against FieldTurf which alleges two claims for relief for IIPEA and unfair competition.

The court heard oral argument on March 19, 2004. By this order, the court now renders its decision granting SportFields' motion for summary judgment as to FieldTurf's complaint against it, and granting in part and denying in part SportFields' motion for summary judgment on its counter-complaint against FieldTurf.

### STATEMENT OF FACTS [2]

This action arises out of the construction of a synthetic turf sports playing field for

---

1. SportFields LLC and Orion Corporation are the only remaining defendants in this action. Pursuant to a Stipulated Dismissal, defendants Sprinturf, Inc. and Empire and Associates, Inc. were dismissed from the case.

2. Except as otherwise stated by reference to the relevant parties' statement of undisputed

the Folsom–Cordova Unified School District's (the "District") new Folsom High School (the. "Project"). Key representatives for the District with regard to the Project were the District's Director of Facilities, Matt Washburn ("Washburn") and Folsom High School's Athletic Director, Peter Maroon ("Maroon"). Reobbelen Contracting Services ("Reobbelen") managed the Project on behalf of the District. Rainforth Grau was the architect for the Project, and its key representative was Chris Smith ("Smith").

FieldTurf had installed a synthetic turf sports field in a local park, Mahany Park, and the District initially desired to have essentially the same field installed on the Project. Rainforth Grau created the initial specifications for the synthetic turf for the Project based on the Mahany Park bid documents (the "Original Specifications") which were included in Section 02791 of the Project Manual for the New Folsom High School Phase 3, dated March 1, 2002 (the "Project Manual"). The Original Specifications included qualifications for the bidders and requirements for the synthetic turf materials. In particular, the Original Specifications required the materials to be "Pro series soccer synthetic grass system manufactured by FieldTurf, distributed by SportTech, Rohnert Park, CA 707–586–8873, or approved equal."

These specifications for materials included certain elements covered by FieldTurf's patents, numbers 5,958,527 and 6,338,885 (the "Patents"); in particular, the Original Specifications reference (1) a layered infill mixture of sand and rubber and (2) a porous secondary backing.

In March 2002 SportFields became aware of the Project. Its sales representative John Reese ("Reese") began work on the sales process for SportFields. The product which SportFields was proposing was "PerfecTurf." (FieldTurf's Resp. to SportField's Stmt. of Undisputed Facts ["FT's RUF"], filed Feb. 6, 2004, 12.) PerfecTurf does not include any of the Patent claims, i.e., it does not use sand for infill nor does it have a porous backing or cryogenic rubber. (FT's RUF 14.)

Reese met with Jeff Grau of Rainforth Grau and left specifications and samples of SportFields' product. On May 3, 2002, Reese learned from Lou Reeboy ("Reeboy") of Reobbelen that the Project was out for bidding. Prior to that, Reese had provided information to Reeboy including the specifications of SportFields' product, costs and a timeline.

The Project "walk through" and informational conference was held on May 7, 2002. Prior to the walk through, Reese and Matt Brown ("Brown") (another SportFields' representative) met with Maroon, Folsom High School's Athletic Director. Reese and Matt Brown told Maroon that the Original Specifications appeared to sole source FieldTurf's product, and that SportFields could not supply a product which complied fully with

and/or disputed facts, the facts recited below are undisputed and/or the parties dispute with regard to the fact is not material and thus the court treats the fact as undisputed. (See SportFields' Analysis of FieldTurf's Resp. to SportFields' Stmt. of Undisputed Facts, filed Feb. 17, 2004). Additionally, FieldTurf "disputes" a number of SportFields' facts (Nos.11, 16, 20, 21, 22, 23, 24, 25, 40, 41, 56, 57, 58, 65) on the basis that it lacks personal knowledge regarding the occurrence; said statement is not grounds for finding a "dispute," and thus the court treats these facts of SportFields as undisputed. Finally, FieldTurf "disputes" certain SportFields' facts (Nos.1, 2, 3, 5, 8, 15, 17, 22, 38, 47, 59, 60, 68, 69, 70, 71, 74, 79, 81, 82, 83, 86, 87, 88, 90, 91) with reference to legal argument and no factual references or irrelevant factual references which do not refute the undisputed fact stated; as to these instances, the court likewise treats the facts as undisputed.

the Original Specifications. Following the walk through there was another meeting among Reese, Matt Brown, Jim Smith representing the District, Maria Balbierz (project manager for Roebbelen), Balbierz' supervisor, Brad Meade ("Meade"), and Smith of Rainforth Grau. SportFields again communicated that the Original Specifications precluded competitive bidding and that SportFields could not comply with the Specifications. Meade and Jim Smith indicated that the Specifications would be revised to ensure competitive bidding. A representative of FieldTurf was present at the informational meeting when SportFields' representatives, and the representatives, of other companies, raised their objections to the Specifications.

On May 14, 2002 SportFields flew Washburn and Maroon to the state of Washington to inspect synthetic turf field installations. Darrell Brown of SportFields met them in Washington and provided the tour. They inspected a SportFields' installation at McChord Air Force Base, and a Fieldturf installation at Washington State University. Darrell Brown explained the differences between the two products and left Washburn and Maroon with samples of the products and literature for SportsFields' product. (FT RUF 31.)

FieldTurf was aware of these events. On May 13, 2002 a FieldTurf representative, CJ Collins ("Collins"), sent an e-mail to Maroon referencing the trip to Washington and suggested certain tests Maroon should perform to compare FieldTurf's and SportFields' products. Collins suggested Maroon "try to pick up the field by pulling up on the fibers" to compare how much of the surface rises up on the all-rubber fields as compared to FieldTurf's fields, which layer in "sand with the rubber." He also suggested Maroon "push [his] finger down into the infill" to compare how far his finger would go down on the all-rubber fields versus the difficulty in pushing his finger down into the infill of a FieldTurf field.

Additionally, on May 13, 2002 Andrew Rowley ("Rowley") of FieldTurf wrote to both Washburn and Maroon. Those letters note the differences between the products and urge the District not to change the Specifications. The letters stated "in order for FieldTurf to bid on your project, it must include *all* of the specifications for our field in terms of materials and installation methods." Rowley wrote further:

> Forty-four out of forty-seven fields (colleges, high schools and cities) in Northern California have **specified/sole sourced** FieldTurf ... Every public school in Northern California has specified a product and company outright and we encourage you to do the same! **No school district has ever had any liability problems doing this**. (Emphasis added.)

(Ex. B to Washburn Decl., filed Oct. 21, 2003.) Rowley's letter is consistent with FieldTurf's practice of trying to include its patent elements in specifications in order to obtain work. Specifically, with respect to the Project, FieldTurf sought to have its patented elements of round cryogenic rubber, rounded silica sand, layered system of infill and porous backing included in the Specifications.

On May 15, 2002 Darrell Brown of SportFields sent an e-mail to Maroon which attached the turf specifications used for a project at Santa Barbara Community College. Those specifications were sent as an example of open bidding specifications. Darrell Brown indicated possible changes to the sample specifications in order to improve them, and he highlighted where competitors might have issues bidding on the unrevised specifications.

FieldTurf representatives also had a number of communications with the District and its architects relevant to the Project. On April 8, 2002, Smith of Rainforth Grau sent an e-mail to Rowley regarding the Original Specifications. The e-mail attached the specifications for the Mahany Park project noting that it needed revisions:

When I receive your revised spec. section I will issue it with Addendum No. 1 along with the revised grading plan showing drainage and subgrades.

We really want your system, so if you have anything the "other guys" don't then go ahead and use it to keep out the "bozos." Thanks for your help.

The Specifications in Addendum 1, which followed on April 23, 2002 (the "Addendum 1 Specifications") were different from the Original Specifications. The Addendum 1 Specifications had a new requirement for infill having "cryogenic rubber." This requirement is covered by FieldTurf's Patents. Later, on May 17, 2002 Rowley sent by facsimile to Rainforth Grau a mark-up to the Addendum 1 Specifications. The mark-up deleted the "or equal" provision and included the additional provision, "sand must be dust free, rounded silc [sic] sand, any other sand will not be accepted." This provision is also part of FieldTurf's Patents. These revisions appeared in the final version of the Specifications as Addendum 3 to the Project Manual, dated May 21, 2002.

On May 17, 2002, Rowley also sent an e-mail to Washburn which attached a summary of potential competitor bids based on prior bid activity and noted some product differences. The attachment to the e-mail reads in part, "This will give you more ammo to say it was a competitive bid and you just set a specification for the track and field."

The bid date for the Project was extended to May 28, 2002. On May 26, 2002 Reese obtained the revised Specifications (the Addendum 3 Specifications). However, the Addendum 3 Specifications were not revised in a manner which Reese believed clearly permitted substitute products on the face of the document. Reese called Smith of Rainforth Grau with his concerns on May 26, 2002. Smith responded that it was too late to make changes to the Specifications, and that Reese should do the best he could and submit a bid anyway.

Maroon and Washburn knew, prior to SportFields submitting its bid, that SportFields could not and would not supply a synthetic turf product which included FieldTurf's patent elements, including cryogenic rubber, silica sand and a layered sand and rubber infill. The District would rely upon the post-bid substitution process to clarify and approve the specific synthetic turf product to be installed and did not correct specifications pre-bid as requested because of lack of time. (FT RUF 80.) The District anticipated that bids would for the most part be for the same synthetic turf product reflected in the Specifications, but the product did not have to be identical. Through a post-bid process deviations from the specifications might be approved, and if the proposed product was not acceptable the bid would be rejected.

SportFields bid on the Project. In bidding on the project, SportFields did not submit a "Request for Substitution" to the Specifications. SportFields was the low bidder and won the contract. The District and SportFields commenced the post-bidding process of product approval. (FT's RUF 62.) However, on May 31, 2002, FieldTurf asserted, for the first time, that the bidding infringed its Patents. Counsel for FieldTurf wrote to SportFields and other companies that had bid asserting its

patent claims and demanding the withdrawal of the bids. As a result of FieldTurf's claims, the District decided to reject all bids and re-bid the Project. The District did so. FieldTurf did not rebid, and SportFields won the contract and supplied its product, PerfecTurf.

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). One of the principal purposes of the rule is to dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). If the moving party does not bear the burden of proof at trial, he or she may discharge his burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. Once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The evidence presented by the parties must be admissible. Fed.R.Civ.P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. City of Niagara Falls*, 754 F.2d 49, 57 (2d Cir.1985); *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense. *See* Fed.R.Civ.P. 56(a) ("A party seeking to recover upon a claim [may move] for a summary judgment in the party's favor upon all or any part thereof."); *see also Allstate Ins. Co. v. Madan*, 889 F.Supp. 374, 378–79 (C.D.Cal.1995). The standard applied to a motion for summary adjudication is the same as that described above for a motion for summary judgment. Fed.R.Civ.P. 56(a), (c); *Mora v. Chem–Tronics, Inc.*, 16 F.Supp.2d 1192, 1200 (S.D.Cal.1998).

## ANALYSIS

### A. FieldTurf's Patent Infringement Claims

■ FieldTurf contends that SportFields infringed its Patents when SportFields submitted its bid to the District, which incorporated FieldTurf's patent elements via the Project Specifications, without modification. FieldTurf asserts that

the bid document, itself, alone constitutes an infringing "offer to sell" under the United States Patent Act. Title 35 U.S.C. § 271(a) provides: "whoever without authority makes, uses, *offers to sell,* or sells any patented invention, within the United States ... during the term of the patent therefor, infringes the patent." (Emphasis added.) An offer to sell is defined as "a description of the allegedly infringing merchandise and the price at which it can be purchased." *3D Systems, Inc. v. Aarotech Laboratories, Inc.,* 160 F.3d 1373, 1379 (Fed.Cir.1998). According to FieldTurf, the court need look no further than the bid document to find an infringing offer to sell in this case.

It is undisputed that the final Specifications for the Project included FieldTurf's patented elements. It is also undisputed that SportFields submitted a bid which incorporated those elements. SportFields agreed in submitting the bid to "[D]o a complete job of all SYNTHETIC TURF SYSTEM all for the lump sum bid price ... in accordance with the Bid Document, Project Manual, Technical Specifications ... to complete the intended scope of work." (Ex. F to Factor Decl. in Supp. of Cross–MSJ, filed Feb. 6, 2004, at 7.) The scope of work was defined in the bid as "[s]pecific work of this trade as defined in the following Specification Sections ... 02791 Synthetic Turf System." (*Id.* at 8.) Section 02791 describes a synthetic turf product which includes elements of Field-Turf's patents.

However, this court is not bound by the bid document alone in determining whether an infringing "offer to sell" was made. Rather, the court must look at all the surrounding circumstances.

> Subsequent cases [to *3D Systems* ] discussing offers to sell under § 271(a) have applied federal statutory construction principles rather than state contract law, examining the facts and circumstances surrounding the communication alleged to constitute an "offer to sell" to determine whether a patent was infringed.

*Natare Corp. v. Aquatic Renovation Systems, Inc.,* 99 F.Supp.2d 986, 990, 991 (S.D.Ind.2000) (rejecting plaintiff's argument that the court should consider only the subject bid documents, rather than all the surrounding circumstances, because the court does not "rely on state contract law to determine if there was an infringing offer to sell"); *accord HollyAnne Corp. v. TFT, Inc.,* 199 F.3d 1304, 1309 (Fed.Cir. 1999); *Cognitronics Imaging Sys., Inc. v. Rocognition Research Inc.,* 83 F.Supp.2d 689, 695 (E.D.Va.2000); *Quality Tubing, Inc. v. Precision Tube Holdings Corp.,* 75 F.Supp.2d 613, 624 (S.D.Tex.1999). When considering all the circumstances in this case, the court cannot find that in submitting the subject bid, SportFields infringed FieldTurf's patents.

First, SportFields proposed to provide the District with a non-infringing product, its PerfecTurf product. FieldTurf's attempts to refute this fact are unavailing. FieldTurf, relying on only a portion of the testimony of Darrell Brown, argues that SportFields could have provided any type of infill system with its PerfecTurf product, including an infringing infill system. (FT RUF 12; FT Smt. of Undisp. Facts in Supp. of Opp'n to SF MSJ, filed Feb. 6, 2004 ["FT UF"], 26.) Upon consideration of Brown's complete testimony, this assertion is unsupportable. Brown testified in his deposition that in 2002 the only infill systems available with the PerfecTurf product were an all rubber or a sand/rubber infill; SportFields did not offer an infill consisting of a layer of a mixture of sand and rubber and another layer of substantially all rubber; SportFields did not offer cryogenic rubber in either system;

SportFields did not offer rounded silica sand, only fractured sand; SportFields' layering system was fractured sand topped by ambient ground rubber. (SF's Reply & Opp'n to Cross–MSJ, filed Feb. 17, 2004, at 2–3 [citing relevant sections of Brown's deposition]) Thus, there is no evidence that SportFields could or did offer an infill system that violated any of FieldTurf's Patents.

Second, based on SportFields' numerous communications with the District prior to submission of its bid, the District *knew* SportFields legally could not and would not provide an infringing product. (SF Stmt. Of Undisp. Facts in Supp. Of MSJs, filed Oct. 21, 2003 ["SF UF"], 4, 22, 24, 57, 58, 79.) In particular, Washburn's declaration states:

> I understood, before it was made, that the bid for the Turf Installation submitted by [SportFields] was not for a product which conformed with the [Specifications] ... SportFields had told me that it generally used an all rubber field, rather than a combination sand and rubber field, but that it could submit a bid for a combined sand and rubber field; provided, however, that it could not and would not conform to the Specifications because it could not use the same layering systems as FieldTurf.

(Washburn Decl., ¶ 4.)

To refute Washburn's declaration, FieldTurf relies on Washburn's deposition testimony in which he testified that he anticipated the bids to be "for the most part" for the turf in the Specifications, and that immediately after the bidding he was not clear on what SportFields was providing in relationship to the Specifications. (FT UF 73, 74.) However, Washburn also testified that proposed products did not have be identical to the Specifications and that deviations from the specifications could be approved through the post-bid process.

(SF UF 82.) Thus, while the District anticipated that bids would, for the most part, be for the synthetic turf product reflected in the Specifications, the product did not have to be identical; through a post-bid process, deviations from the specifications could be approved, and if the proposed product was not acceptable, the bid substitution could be rejected. (*Id.*) In that regard, when the bid information was presented to the District Board, the Board was presented with a spreadsheet which identified how SportFields' product was not compliant with the Specifications. (SF UF 90.)

Additionally, it is undisputed that the District did not intend that the Specifications eliminate any bids, they did not correct the final Specifications before bidding because of a lack of time, and they were relying upon the post-bid substitution process to clarify and approve specific products. (SF UF 80.)

Notably, FieldTurf itself insured that the District knew exactly what SportFields could and could not provide. On several occasions, FieldTurf representatives discussed with Washburn and Smith the differences between the FieldTurf product and its competitors' products, including SportFields' product. (FT RUF 35, 85, 86.)

Finally, and importantly, FieldTurf caused the District to include its patented elements in the Specifications. This fact is undisputed.

Nearly identical circumstances were present in the *Natare* case. 99 F.Supp.2d at 986. In *Natare,* through communications similar to those between FieldTurf and the District here, Natare Corporation caused its patent claims to be included in bid specifications for a public swimming pool project. *Id.* at 987–88. Natare's competitor, Aquatic Renovation Systems

("ARS") submitted a bid on the project which incorporated Natare's system patent. However, like here, ARS had previously made clear to the park district that it not intend and could not provide a product which met the bid specifications exactly because of Natare's patent. *Id.* at 988. Natare asserted ARS' bid constituted an "offer to sell" its patented system of pool liner installation as described in the bid specifications, thereby violating Natare's patent rights and § 271(a). The court found that ARS had made it clear to the district, prior to its bid submission, that it was offering to provide its own pool liner system, not Natare's patented system, and that "a conclusion that ARS infringed Natare's patent based on this evidence would be unfair and contradict the case law placing substance above form." *Id.* at 991. The court further concluded that the terms of the bid documents did not constitute an offer by ARS to supply an infringing system because the documents permitted the customer, the park district, to make corrections and interpretations as necessary to fulfill the intent of the contract documents. Also, the documents could be interpreted to permit any system meeting or exceeding the desired performance characteristics. In other words, the documents permitted "alternates." *Id.* at 991–92. Similar provisions appear in this case. Importantly, the *Natare* court's analysis did not stop there. The court found that its decision was further supported by the fact that the bid specifications which included Natare's patents were the result of *Natare's* actions, and that Natare could not be permitted to benefit from such wrongful conduct. *Id.* at 993–94.

The material facts of *Natare* are remarkably similar to the facts of this case: (1) the patent holder caused the patent claims to be included in the bid specifica-

tions; (2) there was never an intent to provide an infringing product; (3) the public entity knew that there was no intent to provide an infringing product; (4) there was extensive communication between the parties with respect to what the bidder could and could not do and that the product to be supplied would not infringe; (5) the public entity requested the bid of the alleged infringer; and (6) the bid did not explicitly indicate that it was based on a substitute system or that it deviated from the specifications.

In an attempt to distinguish *Natare*, FieldTurf points to an Addendum that was executed by the park district at the request of ARS in order to allow competitive bidding on the project. This fact does not distinguish the case; indeed, it is more of a similarity than a difference. Here, as in *Natare*, the problems with the bid specifications (i.e., that they contained patented elements) was brought to the attention of the public entity. Here, as in *Natare*, there were Addendums. Here, as in *Natare*, the purpose of the Addendums was to permit open bidding. (SF UF 25, 69, 80, 81.) Regarding Addendum 3 in this case, Washburn testified "The intent on this was to make the specification so that it wasn't specific to just FieldTurf, that it could be bid by other parties." (SF Undisp. Facts in Resp. to Cross–MSJ, filed Feb. 17, 2004, 1.) The only additional fact in this case is that FieldTurf was able to persuade the District into believing that the Addendums accomplished the District's goal of open bidding, when in fact they did not. (SF UF 69, 81.) Such wrongful conduct should not be rewarded.

For these reasons, the court grants summary judgment in favor of SportFields as to FieldTurf's patent infringement claims.[3]

3. The court notes that a further, alternative basis for granting SportFields' motion is pro-

## B. FieldTurf's IIPEA and Unfair Competition Claims

Because the court finds above that SportsFields did not infringe Fieldturf's Patents, the court must also grant summary judgment in favor of SportFields as to FieldTurf's claims of IIPEA and unfair competition. Said claims require demonstration of a "wrongful act." Here, the only alleged wrongful act is patent infringement. Because the court finds against FieldTurf on that issue, there is no basis for assertion of these claims against SportFields.

## C. SportFields' IIPEA Counterclaim

 SportFields counterclaims against FieldTurf for IIPEA on the grounds that FieldTurf caused the Specifications to include the Patent claims, purportedly excluding all other bidders, and through its complaints of infringement to the District caused the Project to be rebid after SportFields won the original bid. The elements of an IIPEA claim are: (1) the existence of a prospective economic relationship with a probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship and intent to disrupt it; (3) actual disruption of the relationship; (4) the disruption is caused by the defendant's conduct; and (5) damages are suffered by plaintiff. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003).

 SportFields presents evidence establishing each of these requirements: SportFields was the low bidder on the Project for the May 28 bid and ultimately obtained the Project (SF UF 72, 73.) FieldTurf was aware that SportFields was the low bidder, demanded that Sportsfields withdraw its bid and wrote to the District demanding that it not accept SportFields' bid. (*Id.* at 74, 75, 76.) As a result of such demands, the District did not award the contract to any of the bidders, rejected all bids, and, instead, rebid the Project. (*Id.* at 77.) As a result, SportFields was delayed in the Project and receipt of income, incurred the expenses of two bid processes and is incurring the expenses of this litigation. (Matt Brown Decl., filed Oct. 21, 2003.)

FieldTurf challenges SportFields' showing on the sole ground that it did not "cause" the subject disruption of the contract between SportFields and the District. FieldTurf admits it sought to have its Patent claims included in the Specifications. For instance, FieldTurf does not dispute that in a May 13, 2002 letter from Rowley to Washburn and Maroon, Rowley wrote:

**We ask that in your specifications that you demand a consistent, proven,**

vided under California Public Contracts Code section 3400(a). "No agency of the state ... shall draft or cause to be drafted specifications for bids, in connection with the construction, alteration, or repair of public works, (1) in a manner that limits the bidding, directly or indirectly, to any one specific concern, or (2) calling for a designated material, product, thing, or service by specific brand or trade name unless the specification is followed by the words 'or equal' so that bidders may furnish any equal material, product, thing or service." Thus, pursuant to this code, substitute products are required to be considered. Moreover, the Project Manual provides that the contract documents should be construed to conform to the law and revised accordingly. "Each and every provision of law required to be inserted in the Contract Documents shall be deemed to be inserted therein, and the Contract Documents shall be read and enforced as though it were included therein." Thus, the court must construe the bid documents to allow submission of substitute products, and therefore, SportFields cannot be held to have infringed FieldTurf's patent merely by assertion of a bid which incorporated FieldTurf's patented elements.

high quality fiber, infill layered mix, porous backing and other quality materials and installation methods ... We would respectfully urge you to stick with the current specifications ... Please remember that in order for FieldTurf to bid on your project, it must include *all* of the specifications for our field in terms of materials and installation methods ... We use only the best quality materials in the field including silica (dust free, round) sand, cryogenic rubber, a porous backing (no punched holes), a layered infill mix, sewn seams, etc. We cannot bid the project if it does not include all these key features. (Emphases in original)

(Washburn Decl., Ex. B.) FieldTurf nonetheless argues that the actions of its representatives, in particular Rowley and Collins, are irrelevant because the District, not FieldTurf, had ultimate authority over the Specifications.

FieldTurf's argument is unavailing because it ignores FieldTurf's own complicity. FieldTurf admits that it submitted its Patent claims for inclusion in the Specifications in response to the request of the District's architect for items that would prevent others from bidding. (SF UF 91.) Specifically, Rowley acknowledges that, in response to Smith of Rainforth Grau's request for modifications to the Specifications in order to restrict bidding, he sent Smith a marked-up version of the Specifications which deleted the "or equal" provision and added the rounded silica sand patent element. (*Id.*) Further, Rowley and Collins admit FieldTurf regularly tries to have its Patents claims included in Specifications wherever they can. (*Id.* at 83.) Thus, by causing the inclusion of its Patent Claims in the Specifications, FieldTurf sought to eliminate bidders, including SportFields.

Moreover, ultimately, FieldTurf mislead the District into believing that the final specifications for the Project (which incorporated all previously described "Addendums") permitted open bidding. Washburn testified, "We asked FieldTurf prior to the bid, can other companies, other vendors bid this spec? And they said yes." (*Id.* at 81.) Additionally, Smith of Rainforth Grau, testified, "The representatives from FieldTurf told me that the Specifications were written broadly enough to allow other companies to bid and assured me that there was no interference with FieldTurf's proprietary information because the Specifications were *generic.*" (*Id.* at 69.) (Emphasis added.) FieldTurf offers no evidence rebutting this testimony.

Finally, FieldTurf's argument that its actions were justified because SportFields and others also sought to influence the Specifications is without merit. FieldTurf ignores the fact that SportFields and others were trying to open up bidding, not restrict the specifications with their own patent claims. (SF UF 18, 39, 40, 41.) Specifically, SportFields sought to have the Specifications modified to eliminate the portions with which only FieldTurf could comply. (SF UF 21, 23, 24, 25, and 58.) Such efforts, however, were thwarted by FieldTurf. (SF UF 35, 36, and 37.)

As discussed by the court in *Natare*, such conduct cannot be tolerated. Although not confronted with a claim of IIPEA or unfair competition, the court in *Natare* remarked that were it to have accepted Natare's claims that ARS infringed its patent, "serious questions would have arisen as to Natare's culpability in the matter." *Natare*, 99 F.Supp.2d at 993.

Natare argues that the Park District's bid specifications "clearly require that bidding parties offer the patented swimming pool liner installation method...."

Natare's president, Mr. Walsh, admitted that as a matter of course Natare tries to persuade buyers to include Natare's materials in their requests for bids but does not receive assurance that the materials in question will evidence Natare's ownership of the termination method. In this case, Natare's actions would have led to the infringement of its own patent because it induced a potential buyer to require other bidders unfamiliar with the patent to unwittingly offer to install a pool liner using the patented methods. Natare's practice of persuading entities to use its specifications in their bid solicitations in effect prevents anyone except Nature or its licensees from bidding on the entities' projects. We caution Natare that courts will not allow a patent holder to misuse its patent by expanding its monopoly rights beyond the patent's lawful scope.

*Id.* Nearly identical facts are present here, and when applied to SportFields' claim for IIPEA require an award of summary judgment in SportFields' favor. FieldTurf's conduct inducing the District to include its Patents in the Specifications caused the disruption of the relationship between SportFields and the District. SportFields is thus entitled to summary judgment on its IIPEA claim against FieldTurf, with an amount of damages to be subject to proof at trial.

### D. SportFields' Unfair Competition Counterclaim

■ Under California Business and Professions Code section 17200, unfair competition includes any "unlawful, unfair or fraudulent business act or practice." *See also Saunders v. Sup.Ct.,* 27 Cal.App. 4th 832, 33 Cal.Rptr.2d 438 (1994). Pursuant to section 17203, said conduct may be enjoined by the court. SportFields herein requests an injunction "restraining Field-Turf from taking any action to directly or indirectly have any specification for any public works project include any requirement covered by any of its patent claims."

■ For the same reasons as described above, FieldTurf's conduct in inducing the District to include its Patent claims in the Project's Specifications and in disrupting the relationship between SportsFields and the District constitutes an "unfair" business practice within the meaning of section 17200. The court however finds that SportFields has failed to make the requisite showing for entitlement to an injunction on the basis of a violation of section 17200. *Sun Microsystems, Inc. v. Microsoft Corp.,* 87 F.Supp.2d 992, 1004 (N.D.Cal.2000) (injunctive relief under section 17203 has no application to completed wrongs absent a showing of threatened future harm or a continuing violation). SportFields submits no evidence that FieldTurf is continuing its unfair business conduct or that the subject conduct is likely to reoccur. Thus, the court denies SportFields' motion for summary judgment as to this claim.

### E. Attorney Fees

Under Title 35 U.S.C. section 285 the court may award in "exceptional cases" reasonable attorney fees to the prevailing party in patent infringement cases. While the court has not determined if this is an "exceptional case," as the prevailing party on the patent claims herein, SportFields may bring a motion under section 285. Said motion shall be filed within 30 days of the date of this order.

### CONCLUSION

Defendant and counter-complainant SportFields' motion for summary judgment on plaintiff FieldTurf's complaint against it is GRANTED in its entirety. FieldTurf's cross-motion for summary ad-

judication as to its patent claims is accordingly DENIED. Regarding FieldTurf's patent claims, SportFields may file a motion for attorney fees within 30 days of the date of this order.

SportFields' motion for summary judgment on its counter-complaint against FieldTurf is GRANTED IN PART and DENIED IN PART; SportFields' motion is granted as to its IIPEA claim against FieldTurf, with an amount of damages to be subject to proof at trial; SportFields' motion is denied as to its claim for unfair competition against FieldTurf.

IT IS SO ORDERED.